York WILSON, Jr., Appellant,

v.

CITY OF KOTZEBUE and Alaska Insurance Company, Appellee.

No. 4256.

Supreme Court of Alaska.

May 1, 1981.

William G. Azar, William K. Walker, Kennelly, Azar & Donohue, Anchorage, for appellant.

David H. Bundy, Ely, Guess & Rudd, Anchorage, for appellee.

Before RABINOWITZ, C. J., and CONNOR, BURKE and MATTHEWS, JJ.

OPINION

MATTHEWS, Justice.

On the afternoon of October 13, 1975, York Wilson, a 27-year old native of Kotzebue and his wife, Marie Wilson began drinking beer at the Golden Whale, a bar in Kotzebue. After about four hours, they went to a liquor store, bought some whiskey and then went to the home of Wilson's brother, Morris where they continued to drink. Marie and Morris' wife fell asleep in the early morning, but York and Morris stayed up drinking all night. The next morning, when the liquor store opened, Wilson and his brother bought two 6-packs of beer and two fifths of whiskey. They drank till late afternoon, and then Wilson and his wife went back to the Golden Whale, where they drank until about 7:00 p. m. They then went to a liquor store and purchased another fifth of whiskey and walked around drinking it. They came upon a cab that had its engine running, and Wilson decided to go for a drive. He told his wife to get into the car, they drove around town for a little while, and then stopped near the hospital. They got out and walked some more, continuing to drink. When they saw the police approach, Wilson told his wife to go back to his brother's house.

When Arthur Fields learned that night that one of his cabs was missing, he and another man went looking for it. He found the cab, and followed tracks in the snow which led to Wilson. When he saw Wilson staggering around, he called the police. Patrolman Al Downey was dispatched to the scene and arrived accompanied by Fields and two others, Billy Howarth, an ex-policeman and Jeff Smith, Fields' son-in-law. Downey told Wilson he wanted to take him to the station for questioning, and Wilson refused. Downey took hold of Wilson's

arm, but Wilson resisted. Wilson struggled, but with the assistance of Fields and Howarth, Downey was able to get Wilson handcuffed and into the truck which transported him to jail. Wilson also resisted being taken from the truck into the jail, and it took from 15 to 30 minutes to get him into the cell. Once Wilson was in the cell, his handcuffs were removed because he complained that they hurt. Before Downey could get the cell door closed, Wilson positioned his arms and legs in a way that prevented them from doing that, so Downey directed Howarth to spray him with mace. The mace caused Wilson to back away from the cell door, which was then closed and locked. Downey then left on another call, and the others also left, leaving only Katherine Swan, the dispatcher who was on duty, and Martha Henry, another dispatcher whose shift was to begin later, at the jail with Wilson.

Downey did not search Wilson before he left, nor at any time that night. Downey had been an officer for less than six weeks. He testified that he received no training regarding his duties, and did not know that it was his responsibility to search prisoners.

After Downey left, Wilson started demanding that the dispatcher contact his wife and have her bring his glasses to him. He threatened to burn down the jail [1] if his glasses were not brought to him. When Swan was unable to reach his wife, Wilson took a lighter from his pocket, ignited his glove and put it on the floor next to a foam mattress that was in his cell. Swan called Downey and reported this event to him, and he arrived at the jail about ten minutes later. Downey extinguished the fire by throwing a bucket of water through the cell door. At that time the water pipes in the jail were frozen and had been for at least two or three weeks and the only water in the jail was what was in the bucket. Downey stayed long enough to be sure that the fire was out, about three to four minutes, and then told the dispatcher to contact Corporal Siebert. Downey then left to pick up Siebert, who was not on duty, so that he

could assist him in taking away Wilson's lighter.

After Downey left, Wilson again demanded that he be brought his glasses, threatened to start another fire, and subsequently did so, this time directly igniting the mattress, which burned quickly. The dispatchers first went to the water bucket, which they found to be empty, and then attempted to use the jail's two fire extinguishers. The dispatchers had not been instructed in operating the extinguishers and could not get them to work. Swan contacted Downey and reported the second fire, which was worse than the first one. Downey instructed her to call the fire department and release the prisoner. Henry had difficulty in locating the key to Wilson's cell, looking in the desk until Swan informed her that it was on the wall; two and a half to three minutes passed before she located it. Swan then unlocked Wilson's cell and opened the door, but it swung partially closed again. Wilson yelled for them to open the door and Swan yelled back that it was open. Swan and Henry were about to leave, when Swan decided to swing open the door again. By this time Wilson's clothing was on fire and the fire was rapidly worsening. As Swan and Henry ran outside, Downey arrived. They told him that Wilson was still inside, and Downey entered the jail and found Wilson outside of his cell but still inside the building, wandering around in circles and asking for help. Downey grabbed him and took him outside, where he rolled Wilson around in the snow to extinguish the flames.

Wilson was hospitalized for two months, suffering from second and third degree burns on his face, arms, chest and back.

Wilson brought suit against the City of Kotzebue, alleging that at the time of his arrest he was helplessly intoxicated, and that Kotzebue was negligent in failing to search him after his arrest, failing to remove the lighter from his possession after the first fire, failing to extinguish the fire and failing to remove him from the burning

---

1. The jail was in a quonset hut and the interior was constructed entirely of wood.

jail. Wilson further alleged that Kotzebue was negligent in failing to properly train its personnel in arrest procedures, firefighting, and providing safe custody of its prisoners. Kotzebue and Alaska Insurance Company counterclaimed for damages for the destruction of the jail. The case was tried before a jury, which returned a judgment of $20,000.00 for Wilson and $16,400.00 for Alaska Insurance Company. Kotzebue and Alaska Insurance Company also recovered $6,253.44 in costs and $25,000.00 in attorney's fees. Wilson brought this appeal after the court denied his motions for a judgment N.O.V. and, in the alternative, a new trial.

On appeal, Wilson claims that the trial court erred in giving numerous incorrect jury instructions, in granting a change of venue from Kotzebue to Anchorage, in using an improper measure of damages for the destruction of the jail, and in awarding costs and attorney's fees. We conclude that several of Wilson's claims have merit, and that a new trial is required.

*Duty of Care Instructions*

There is no real dispute between the parties regarding the duty of care owed by a jailer to his prisoner, but they disagree over whether the jury instructions given by the trial court correctly set forth the law on this subject. Wilson claims that the trial court erred in refusing to give three of his proposed instructions. Wilson submitted the following instructions:

One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection has a duty to protect that person against unreasonable risk of harm. Such duty encompasses the duty to guard against risk of self-injury or self-destruction by the prisoner, where the jail personnel are put on notice of an infirmity or condition of the prisoner which prevents him from exercising the same degree of care for his own safety that he would had he not had the infirmity or condition.

If a prisoner, when taken into custody, is intoxicated, and the police and/or jailers were aware of it or should have been aware of it, they owe him a higher degree of care than they owed to an ordinary sane, sober prisoner in control of his mental and physical faculties. They owe such prisoner a duty to reasonably protect him from harm including harm caused by his own act to himself.[2]

The court rejected these instructions and instead instructed the jury as follows:

Instruction No. 13

Negligence is the doing of something which a reasonably prudent person would not do, or the failure to do something which a reasonably prudent person would do, under circumstances similar to those shown by the evidence.

It is the failure to use ordinary or reasonable care.

You will note that the person whose conduct we set up as a standard is not the extraordinarily cautious individual, nor the exceptionally skillful one, but a person of reasonable and ordinary prudence.

Instruction No. 14

One test that is helpful in determining whether or not a person was negligent is to ask and answer whether or not, if a person of ordinary prudence had been in the same situation and possessed of the same knowledge, he would have foreseen or anticipated that someone might have been injured by or as a result of his action or inaction. If such a result from certain conduct would be foreseeable by a person of ordinary prudence with like knowledge and in like situation, and if the conduct reasonably could be avoided, then not to avoid it would be negligence.

Instruction No. 22

A jailer has a duty to exercise reasonable care for the safety of his prisoners. This does not mean that a jailer must guarantee that a prisoner in his custody will not be harmed. It means that a jailer must do what is reasonable under

**2.** The third instruction was identical to this one.

the circumstances to avoid the risk of harm to his prisoner.

Police officers and jailers who take intoxicated prisoners into their custody are under a higher degree of care for such a prisoner's safety and protection, when the officers are aware that the prisoner is in an intoxicated state.

■ The question of what duty is owed by a jailer to a prisoner has not been addressed before by this court. We agree with the majority of courts which hold that a jailer owes a duty to the prisoner to exercise reasonable care for the protection of his life and health. See Annot., 79 A.L. R.3d 1210, 1216 (1977). This duty encompasses the duty to protect or assist a prisoner who is in danger,[3] and is comparable to that owed by a common carrier to its passengers, because prisoners, like passengers, are confined and cannot avail themselves of normal opportunities for self-protection. Some courts have expressed this duty as the exercise of the "utmost caution" or "highest possible care"[4] and some have said that the duty is even higher when the prisoner is intoxicated or known to be likely to injure himself.[5] In *Widmyer v. Southeast Skyways, Inc.*, 584 P.2d 1, 5 (Alaska 1978), this court stated, "[a]irline passengers are completely at the mercy of the carrier and are entitled to assume that the highest degree of care is being taken for their safety."[6]

■ Wilson contends that the general duty of care instructions given by the court do not properly reflect the degree of care actually required by the relationship of jailer and prisoner, and that the one "jailer/prisoner" instruction given is inadequate because it does not speak to self-inflicted injuries. We believe that although the instructions proposed by Wilson are a correct and more complete statement of the law, the instructions given by the court were not erroneous. While it is true that certain special relationships, such as that between jailer and prisoner, require the exercise of greater care than others, this is simply another way of saying that the amount of care required must be commensurate with the amount of risk or responsibility involved,[7] i. e., it is what is reasonable and

---

3. Restatement (Second) of Torts, § 314A (1965) provides in part:

 Special Relations Giving Rise to Duty to Aid or Protect.

 (1) A common carrier is under a duty to its passengers to take reasonable action
 (a) to protect them against unreasonable risk of physical harm, and
 (b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others.
 . . . .
 (4) One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.

 This position seems to have been adopted by many courts which have recently considered the issue.

 See, e. g., Thomas v. Williams, 105 Ga.App. 321, 124 S.E.2d 409 (1962); Haworth v. State, 592 P.2d 820 (Hawaii 1979); Porter v. County of Cook, 42 Ill.App.3d 287, 355 N.E.2d 561 (1976); Barlow v. City of New Orleans, 257 La. 91, 241 So.2d 501 (1970); Thornton v. City of Flint, 197 N.W.2d 485, 39 Mich.App. 260 (1972); Pretty on Top v. City of Hardin, 597 P.2d 58 (Mont.1979); City of Belen v. Harrell, 93 N.M. 601, 603 P.2d 711 (N.M.1979).

 Some older cases hold that the jailer's duty is owed not to the prisoner, but to the public at large. See, e. g., State, Use of Cocking v. Wade, 87 Md. 529, 40 A. 104 (1898); O'Hare v. Jones, 37 N.E. 371, 161 Mass. 391 (1894); Stinnett v. City of Sherman, 43 S.W. 847 (Tex.Civ. App.1897).

4. See, e. g., Acosta v. Southern Cal. Rapid Transit Dist., 2 Cal.3d 19, 84 Cal.Rptr. 184, 465 P.2d 72 (1970); Carson v. Boston El. Ry., 309 Mass. 32, 33 N.E.2d 701 (1941); Oklahoma Transp. Co. v. Claiborn, 434 P.2d 299 (Okla. 1967); Benjamin v. City of Seattle, 74 Wash.2d 832, 447 P.2d 172 (1968).

5. See, e. g., Griffis v. Travelers Ins. Co., 273 So.2d 523 (La.1973); Thomas v. Williams, 105 Ga.App. 321, 124 S.E.2d 409 (1962); Daniels v. Andersen, 195 Neb. 95, 237 N.W.2d 397 (1975); Shuff v. Zurich-American Ins. Co., 173 So.2d 392 (La.App.1965). See also Falkenstein v. City of Bismarck, 268 N.W.2d 787 (N.D.1978).

6. See also Dezort v. Village of Hinsdale, 35 Ill.App.3d 703, 342 N.E.2d 468 (1976); Kimbrell v. American Indem. Co., 56 So.2d 880 (La.App. 1952).

7. See W. Prosser, The law of Torts, § 34, at 180–81 (4th ed. 1971). See also Carson v. Bos-

prudent *under the circumstances.* Although perhaps in cases such as this, involving a special relationship, the ordinary duty of care instruction by itself would not be sufficiently explicit, here those instructions were accompanied by another which was specifically addressed to intoxicated prisoners, and taken together, the instructions were adequate. The instructions were not made deficient by failing to specifically address self-inflicted injuries, for they were broad enough to cover such injuries, and the jury's award of damages to Wilson indicates that the jury was not misled on that point.

■ At the time the incident which is the subject of this lawsuit occurred, the City of Kotzebue had contracted with the State's Department of Health & Social Services for the care and custody of State prisoners. Alaska's Division of Corrections publishes a "Contract Jail Manual" which Wilson contends was issued to the City in connection with this contract. Wilson objected to two instructions which involved this Manual:

Instruction No. 25.

At the time York Wilson, Jr. was injured a Contract Jail Manual had apparently been provided to the City of Kotzebue by the State of Alaska's Division of Corrections which provided in part as follows:

"C. Prisoner Search

(1) On arrival at the institution, the prisoner shall be thoroughly searched for any contraband or articles which

might injure himself, others, or property."

The fact that such a search was not conducted may be considered by you in the light of all the circumstances of this case, in determining whether the defendant or its agents were negligent.

Instruction 26 was essentially the same, but focused on this provision of the Manual:

(4) For the protection of jail officials and offenders, those offenders suspected of extreme intoxication or drug abuse should be examined by a physician or other qualified medical personnel before commitment.

Wilson contends that these instructions should have directed the jury that violations of the Manual provisions constitute negligence *per se,* rather than merely evidence of negligence, citing *Bachner v. Rich,* 554 P.2d 430 (Alaska 1976) and the Restatement (Second) of Torts, § 286 (1965).[8] As argued by Kotzebue, Wilson's reliance on these authorities is incorrect, for they both pertain only to legislative enactments and administrative regulations. The Manual purports to "provide guidelines for non-State political subdivisions to promote the security of the community, ensure the safety of the staff and State offenders, and increase the efficiency of their operations," and is provided "as a courtesy of the Alaska Division of Corrections." The trial court committed no error in instructing the jury that violation of these nonenforceable

---

ton El. Ry., 309 Mass. 32, 33 N.E.2d 701, 703 (1941), in which the court explained: "The fundamental duty of a carrier to take care for the safety of a passenger is settled. That duty is to exercise reasonable care under the circumstances. Among those circumstances are that the carrier has control of the passenger and that the consequences of negligence are likely to be serious. Accordingly it is held that reasonable care under the circumstances is the highest degree of care...."

**8.** Restatement (Second) of Torts § 286 provides:

When Standard of Conduct Defined by Legislation or Regulation Will Be Adopted.

The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part

(a) to protect a class of persons which includes the one whose interest is invaded, and

(b) to protect the particular interest which is invaded, and

(c) to protect that interest against the kind of harm which has resulted, and

guidelines could be considered as evidence of negligence.[9]

Wilson also objected to this instruction:

Instruction No. 30

Every person who, himself, is exercising ordinary care, has a right to assume that every other person will perform his duty and obey the law, and in the absence of reasonable cause for thinking otherwise, it is not negligence for such a person to fail to anticipate an accident which can be occasioned only by a violation of law or duty by another person.

Since Wilson was intoxicated, struggled vigorously upon being detained, and was involuntarily imprisoned for violations of the law, acting on an assumption that he would "perform his duty and obey the law" would be unreasonable. We think that the court erred in giving this instruction under the facts of this case.[10]

### Proximate Cause Instruction

■ Wilson also objected to the court's instruction on legal causation:

Instruction No. 16

A legal cause of an injury is a cause which is a substantial factor in bringing about the injury. Negligent conduct is a substantial factor in bringing about an injury if the accident. *would not have occurred in the absence of the negligent conduct* and if the negligent conduct was so important in bringing about the injury that reasonable persons would regard it as a cause and attach responsibility to it. [Emphasis added].

Citing *State v. Abbott*, 498 P.2d 712 (Alaska 1972), Wilson objects that the "but for" clause is inappropriate where, as in this case, two forces were in operation to cause the injury. As we stated in *Abbott*, the "but for" test is inapplicable when there are two (or more) forces, *and* each one by itself is sufficient to cause the injury. *Id.* at 727. In such cases, the "but for" test does not work because it would result in each force being absolved of liability. *See* Restatement (Second) of Torts § 432, Illustrations 3 and 4 at 431–32 (1965). This is not such a case. Under Wilson's theory of the case, but for the City's various acts of negligence either there would have been no fire, or he would not have been injured by it, or his injuries would not have been so severe. The exception which we referred to in *Abbott* does not apply.[11]

### Comparative Negligence Instructions

Wilson claims that the issue of his own comparative negligence should not have been submitted to the jury because his helpless intoxication relieved him of responsibility for his actions, and the only remaining inquiry is the question of the defendant's knowledge of Wilson's condition. Kotzebue disputed Wilson's claim that he was so intoxicated that he was incapable of exercising due care for himself and maintained that the issue of his comparative negligence was therefore properly one for the jury.

■ The general rule is that voluntary intoxication does not relieve one from liability for the consequences of his intentional or negligent act, and one who becomes in-

---

(d) *to protect that interest against the particular hazard from which the harm results.*

9. *See Dezort v. Village of Hinsdale*, 35 Ill. App.3d 703, 342 N.E.2d 468 (1976), holding that nonenforceable, self-imposed regulations are useful "in illustrating that it has been considered feasible as a matter of custom to undertake certain obligations for the safety and welfare of prisoners." 342 N.E.2d at 472.

Wilson also objected to the use of the word "apparently" in the instructions. The court inserted this because it considered evidence on whether Kotzebue actually ever received the Manual to be inconclusive. Plaintiff does not point to anywhere in the record where this

issue was resolved, and we find his claim of error to be without merit.

10. *See* Restatement (Second) of Torts § 302B, Comments e and f (1965). We need not decide whether this error, standing alone, would warrant reversal, because a new trial is required on other grounds.

11. However, at the re-trial we suggest that the word "accident" be changed to "injury" in the instruction, since "accident" might focus the jury's attention solely on the cause or causes of the fire to the exclusion of the City's allegedly negligent conduct after the fire was underway.

toxicated is held to the same standard of conduct as if he were sober.[12] This rule has been held inapplicable, however, in the case of one who is so intoxicated, and whose mental and physical faculties are so impaired, that he is incapable of exercising due care for himself, where he is in the custody of another who is charged with the duty of caring for his safety. There have been numerous decisions involving mental patients, involuntarily confined drug addicts and prisoners, which have held that recovery for self-inflicted harm is not barred where the plaintiff was incapable of exercising due care by virtue of his mental illness,[13] drug addiction,[14] or intoxication.[15] In such cases, if the defendant has or should have knowledge of the plaintiff's condition, it may be found negligent if it violated its duty of exercising due care for the plaintiff's health and safety, for such duty encompasses the duty to prevent reasonably foreseeable acts involving an unreasonable risk of harm.

 The evidence submitted in this case regarding Wilson's conduct reasonably lent itself to either of two conclusions: (1) Wilson committed an intentional tort, injuring himself in the process; or (2) Wilson was so intoxicated as to be incapable of acting intentionally. The first conclusion bars Wilson's recovery regardless of any negligence on the part of Kotzebue, for a person may not recover for injuries resulting from his own intentional conduct. The court correctly instructed the jury on this point. The second conclusion compels the inquiry of whether the defendant had notice of Wilson's condition, and eliminates the issue of Wilson's responsibility for his acts. There is no evidence from which one could reasonably infer that although Wilson did not intentionally start the fire, he did so negligently. While comparative negligence is usually a question for the jury, in the

12. See W. Prosser, supra note 7, § 32 at 154; Restatement (Second) of Torts § 283C, Comment d (1965).

13. See. e. g., Warner v. Kiowa County Hosp. Auth., 551 P.2d 1179, 1190 (Okla.App.1976) ("In principle we see no reason why an adult who is so mentally ill or drugged that he can not comprehend or appreciate dangers inherent in his acts should not be accorded the same legal protection [as a child of tender years, who cannot comprehend dangers and lacks the capacity to be contributorily negligent]"); Hunt v. King County, 4 Wash.App. 14, 481 P.2d 593, 598 (1971) (Hospital's duty to safeguard its patient under its exclusive control in a closed psychiatric ward contemplates the reasonably foreseeable occurrence of self-inflicted injury whether or not it is the consequence of a volitional or negligent act); Mochen v. State, 43 A.D.2d 484, 352 N.Y.S.2d 290 (1974) (Evidence of patient's mental illness sufficient to show not chargeable with contributory negligence in action for damages sustained when plaintiff jumped out of window while trying to escape).

14. Padula v. State, 48 N.Y.2d 366, 422 N.Y.S.2d 943, 398 N.E.2d 548 (N.Y.1979) (Heroin addicts who drank printing fluid containing methyl alcohol, which was clearly marked as poisonous, not guilty of contributory negligence because unable to resist temptation to ingest euphoria-inducing substance).

15. See, e. g., Dezort v. Village of Hinsdale, 342 N.E.2d 468 (1976) (Intoxicated prisoner who committed suicide not guilty of contributory

negligence if incapable of exercising due care for his own safety); Thornton v. City of Flint, 39 Mich.App. 260, 197 N.W.2d 485, 489 (1972) (Act of plaintiff prisoner, who was chronic alcoholic suffering from delirium tremens, of diving from top bunk in his cell, "although 'intentional,' may not have been one of free volition," and question of whether plaintiff could recover was therefore for the jury); Paris G.N.R. Co. v. Robinson, 140 S.W. 434, 436 (Tex.1911) (The question of contributory negligence cannot arise when the undisputed evidence shows the passenger to be mentally or physically incapable of self protection, and where the railroad company has knowledge of such condition when it accepts him as a passenger). See also McMahon v. New York, N.H. & H. Ry. Co., 136 Conn. 372, 71 A.2d 557 (1950); Barlow v. City of New Orleans, 241 So.2d 501, 505 (La.1970):

While it is true, as a general rule, that voluntary intoxication does not relieve one from negligent conduct or serve to relax the requirement which is imposed upon a person to exercise due care for his own safety . . . this rule is subject to the exception that, where the person is in such a helpless state of intoxication that he is unable to take care of himself and is, as in this case, confined under arrest, recovery for the injuries he has received emanating from a danger to which he is exposed, which is attributable partially to his unconscious act, but against which the defendant should have protected him, is not barred by contributory negligence.

absence of any evidence of such, the submission of the issue to the jury constitutes reversible error. *See Sturm, Ruger & Co. Inc. v. Day,* 594 P.2d 38, 42 (Alaska 1979), *modified on other grounds,* 615 P.2d 621 (1980); *cf. Cummins v. King & Sons,* 453 P.2d 465, 467–68 (Alaska 1969).

■ Wilson also assigns as error the giving of Instruction 28:

At the time York Wilson, Jr. was injured, certain regulations pertaining to jails provided:

10–3141. Reliable means shall be provided to permit the prompt release of inmates confined in locked sections, spaces, or rooms in the event of fire or other emergency regardless of the type of occupancy.

10–3142. Prompt release will be guaranteed by adequate correctional personnel that are continuously on duty (24 hour) and keys which shall be readily accessible.

If you find that the City of Kotzebue, through its agents or employees, violated either or both of the above provisions and that violation was a legal cause of York Wilson, Jr.'s injuries, then you shall find in favor of York Wilson, Jr. and award damages in accordance with the instructions on damages which follow, subject to a reduction by virtue of the negligence of York Wilson, Jr., if any.

Wilson contends that comparative negligence is no defense to violation of the regulations involved because their purpose is "to place the entire responsibility for the harm which has occurred upon the defendant." [16] Our resolution of the general issue of Wilson's comparative negligence obviates discussion of this point except to note that the portion of the instruction directing a reduction in the award of damages for Wilson's comparative negligence should not have been given.

*Sudden Emergency Instruction*

Finally, Wilson objected to Instruction 29:

If you find that a violation of the regulations contained in Instruction Number 28 by a defendant herein is excused, then such violation does not constitute negligence. Violation of the regulations is excused if the City establishes by a preponderance of evidence that it (1) is unable after reasonable diligence or care to comply; or (2) the City or its agents were confronted by an emergency not due to their own actions or failure to act; or (3) if compliance with the statute or regulation would involve a greater risk of harm to the actor or to others.

Wilson contends first that violations of regulations like those in Instruction 28 are never excusable, and second, the violations are not excusable under the facts of this case. Wilson gives the first point only a cursory statement in his brief, citing no authority, and we therefore will not consider it.[17] We believe that Wilson's second point, is meritorious. The first ground posited in the instruction as an excuse for a violation of the regulations, inability after reasonable diligence or care to comply, appears to be, as Wilson contends, without any basis in the evidence submitted, and Kotzebue has not cited anything in the record that supports such an instruction. The second excuse, that Kotzebue was confronted by an emergency not due to its own actions or failure to act, is also untenable.

16. Wilson cites Restatement (Second) of Torts, § 483, Comment c (1965), which provides in part:

There are, however, exceptional statutes which are intended to place the entire responsibility for the harm which has occurred upon the defendant. A statute may be found to have that purpose particularly where it is enacted in order to protect a certain class of persons against their own inability to protect themselves.

17. Former Appellate Rule 11(b)(1)[g] provided in part:

The argument shall contain the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on, and it shall be preceded by a heading indicating the subject matter. *See also L. E. Spitzer Co. v. Barron,* 581 P.2d 213, 218 (Alaska 1978); *Kristich v. State,* 550 P.2d 796, 804 (Alaska 1976).

No sudden emergency could excuse a violation of the regulations cited in Instruction 28, for those regulations are clearly intended to impose certain requirements, for example, readily accessible keys, precisely so that an emergency can be dealt with expeditiously. The onset of an emergency situation cannot serve as an excuse for failing to take precautionary measures which should have been taken *prior* to the emergency.

The last instance of an excused violation under Instruction 29 contemplates a situation where the actor is faced with two or more alternative courses of action, each of which would involve the risk of harm to himself or others, and he must choose between them; if the course chosen is less dangerous than the one rejected, it is not negligence even though it otherwise might be. This excuse, like the other two, is without any basis in the evidence. We hold that the trial court erred in giving Instruction 29.

### Change of Venue

■ Finally,[18] we must address Wilson's claim that the court erred in changing venue from Kotzebue to Anchorage. Wilson claims that the court's decision was an abuse of discretion, violated his rights to due process and equal protection of the law, and was in contravention of public policy. Because we hold that the decision was an abuse of discretion,[19] we need not discuss Wilson's other contentions.

Before the trial commenced, Kotzebue moved for a change of venue, pursuant to AS 22.10.040, from the Second Judicial District to the Third or Fourth Judicial Districts. The motion was based on the claim that the City could not get an impartial trial in Kotzebue. AS 22.10.040 provides:

*Change of Venue.* The superior court in which the action is pending may change the place of trial in an action from one place to another place in the same judicial district or to a designated place in another judicial district for any of the following reasons:

(1) when there is reason to believe that an impartial trial cannot be had;

(2) when the convenience of witnesses and the ends of justice would be promoted by the change;

(3) when for any cause the judge is disqualified from acting, but if the judge of another judicial district is assigned to try the action, no change of place of trial need be made;

(4) if the court finds that the defendant will be put to unnecessary expense and inconvenience and if the court finds that the expense and inconvenience was intentionally caused, the court may assess costs against the plaintiff.

Judge Kalamarides granted the motion, citing three grounds for doing so:

(1) this is a complicated case which would require not only a sophisticated understanding of the application of the law to the facts, but also a case that will require available premises for last minute drafts and research for instructions;

(2) the City of Kotzebue for reasons of the practical situation as an entity in authority, would be unable to have a fair and impartial trial in the City of Kotzebue.

(3) the police department, not being looked upon with favor by the town's people, because of alleged violations of their constitutional rights as individuals by the police officers—as indicated by the prevailing feelings in that area—requires a change of place of trial.

18. Wilson raises two other claims of error, which we do not consider. First, Wilson claims that the court erred in instructing the jury that the measure of damages for the destruction of the jail facility was the cost of replacement. Because this issue is given only cursory treatment in appellant's brief, we decline to consider it. *See* note 17 *supra.* Nevertheless, in the absence of unusual circumstances, the cost of replacement without considering

depreciation or other factors is not generally an appropriate measure of damages. Secondly, Wilson argues that the court's award of attorney's fees was erroneous. Because we are remanding this case for a new trial, we need not reach this issue.

19. *See Brown v. State,* 601 P.2d 221, 229–30 (Alaska 1979); *Maier v. City of Ketchikan,* 403 P.2d 34, 39 (Alaska 1965).

Wilson claims that the first ground cited by the judge for granting the motion would require that the change be to Nome, rather than Anchorage, pursuant to AS 22.10.-030(d).

AS 22.10.030(d) provides:

*Where actions are to be brought.*

. . . .

(d) Subject to § 40 of this chapter, a trial and any precedent or antecedent hearings in an action shall be conducted in a senate district within the judicial district at a location which would best serve the convenience of the parties and witnesses. However, if there is any part of more than one senate district within the boundaries of a borough, the trial and related hearings shall be conducted within the borough's boundaries at a location which would best serve the convenience of the parties and witnesses. *If the presiding judge of the district determines that there are no facilities, reasonably suited to the purpose, available for the trial or related hearings in the senate district specified in this subsection, he may direct the proceedings to be held in the nearest senate district with reasonably suitable facilities.* [Emphasis added].

Wilson maintains that since the senate district with suitable facilities nearest to the one in Kotzebue is in Nome, a change of venue based on that ground should have been to Nome, rather than Anchorage. The City argues that since AS 22.10.030(d) expressly states that it is subject to AS 22.10.-040, which provides for a change of venue "from one place to another place in the same judicial district *or* to a designated place in *another judicial district*," the trial court's action was proper. This argument misconstrues the statutes. Although the provisions regarding where an action is to be brought in § .030(d) are subject to § .040,

the reasons specified in § .040 for a change of venue do not include inadequacy of facilities, and therefore. that reason by itself cannot warrant a change except to the nearest senate district with suitable facilities. Thus, the order changing venue from Kotzebue to Anchorage cannot be sustained on the first ground cited.[20]

■ The second ground upon which the court based its decision was that the City, "as an entity in authority" could not receive a fair trial in Kotzebue. Mention of this indicates that the court accepted the City's argument that it could not get a fair trial in Kotzebue because

there is a general unwillingness to accept personal responsibility for anything, and a correspondingly strong dependence on governmental and service agencies. This results in a very strong feeling that one is "owed" various forms of support. Thus a local government which does not "take care" of its citizens is unsatisfactory.

Kotzebue based this argument primarily on an affidavit of Dr. Arthur Hippler, an anthropologist. Dr. Hippler's conclusions, applicable to Alaskan Eskimos in general and not merely those residing in Kotzebue, included the following:

The recent provision of all sorts of services for Eskimos, with no demand upon Eskimos for either payment or organizational ability to assist in administering such programs; the totally accepted assumption that Eskimos should be hired by government and private agencies, not because of any particular ability, but because of race, has, I believe, eroded nearly to extinction any semblance of a belief in personal responsibility for anything. At present few Eskimos who express any opinion on the matter at all think it odd that their personal needs are cared for from cradle to grave, and many feel they should receive much more.... Some Eskimos have expressed the belief that welfare payments should start at $30,000

---

20. In *Maier v. City of Ketchikan*, 403 P.2d 34 (Alaska 1965), we stated:

Standards pertaining to change of venue are · prescribed by statute. Within the boundaries of those standards, the decision as to wheth-

er venue will be changed is within the sound discretion of the superior court. [Footnotes omitted].
403 P.2d at 39.

per year since that would make them equivalent to local professional salaries. The difference between largesse and recompense for work is simply not clear to many.

Similar averments were made by Kotzebue's mayor, city manager, and fire chief.[21]

Reduced to its essence the city's argument on this point was that a jury consisting primarily of Eskimos would probably be unfair in a civil case involving a government entity. In other words, Eskimos should be disqualified from jury service in this type of case. We believe that the court erred in accepting this position.

There are now resident superior court judges in three Alaskan cities where Eskimos are the predominant ethnic group.[22] Jury trials have for many years been conducted in these cities. There has emerged from these cases no pattern of jurors being unwilling to follow the court's instructions. To be sure, general community attitudes in these cities may well be different from those which might prevail elsewhere, but such differences can better justify retaining rather than changing venue. As we indicated in *Maier v. City of Ketchikan*, 403 P.2d 34, 40 (Alaska 1965), *quoting, Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509, 67 S.Ct. 839, 843, 91 L.Ed. 1055, 1062–62 (1947):

> In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only. There is a local interest in having localized controversies decided at home.

In *Alvarado v. State*, 486 P.2d 891, 906 (Alaska 1971), we noted the cultural differences that exist between the urban and rural areas of the state and emphasized the importance of local jury selection. We stated that "[w]hen a large segment of the population lives in towns and villages scattered throughout the reaches of the state, we cannot afford to succumb to the temptation of convenience by allowing the machinery of justice to become inflexibly entrenched within the enclaves of our major cities."[23]

The third point mentioned by the trial court in granting the motion to change venue was that the police department was not looked upon favorably by residents of the city. The evidence presented by Kotzebue supporting this ground was an affidavit of the mayor of Kotzebue which stated:

> I am also aware that our local police department is not highly regarded in the community. It is my firm belief that the city is at a distinct disadvantage in a lawsuit such as this, if it is tried in Kotzebue, because residents have a preconceived opinion concerning operation of our police department, which may or may not be deserved. This is not to say that residents of Kotzebue are not law abiding citizens, because they are. What it does mean, however, is that York Wilson, Jr., has an unfair advantage in this lawsuit since the community has a preconceived opinion concerning the police.

At the hearing on the change of venue another city official testified as follows:

> I would say in general the attitude toward the police department is a negative one; that people feel that the police department is not—is not qualified to do—or adequately trained to do what they are

---

**21.** In response to Wilson's request for a trial in Nome, after the Superior Court had ruled that the trial would not be held in Kotzebue, the city argued that the same community attitudes which would preclude a fair trial in Kotzebue also existed in Nome, another city with a predominantly Eskimo population.

**22.** The cities are Nome, Bethel and Kotzebue. At the time of the trial in this case, however, there was no resident superior court judge in Kotzebue.

**23.** The city also argued that venue should be changed because it claimed that the prevailing attitude among Eskimos toward alcohol intoxication was that "people are simply not responsible for either what happens to them, or for what they do to others, when they are drunk." Judge Kalamarides did not mention this argument in his decision and therefore we will not discuss it other than to say that we would reject it for the reasons we have expressed concerning the argument regarding Eskimos' purported attitude toward government.

doing; that they're not doing the best job they can; and that quite often they botch what they attempt to do. And so in general, there is a very negative attitude toward the police department.

This same official testified that the people in Kotzebue "want law enforcement. I think they definitely—the bulk of the people of Kotzebue are law abiding people; that their interest is in seeing that laws are obeyed, that people are not harmed." The evidence presented, in summary, was that the Kotzebue police department was not generally regarded by the residents of Kotzebue as a particularly efficient or competent law enforcement agency.

We believe that basing a decision to change venue on a general community perception such as this is unsound. Holding a general attitude on such potentially germane subjects as the police, lawyers, judges, or insurance rates, has never been regarded as a disqualifying factor. A pollster will always be able to glean the opinion of a community toward the local police. That opinion may be either favorable[24] or unfavorable[25] but in neither case should it serve as a justification for changing venue. The important question in each case is whether there is reason to believe that an impartial jury, that is one which will decide the case based on the evidence presented and in accordance with the court's instructions, cannot be selected.[26] The city fell far short of meeting this standard in its showing concerning community attitudes toward the police department.

For these reasons we conclude that the court abused its discretion in determining that venue should be changed from Kotzebue to Anchorage.

REVERSED and REMANDED for proceedings consistent with this opinion.

24. Various cases, including *Maier v. City of Ketchikan*, 403 P.2d at 39, have held that in suits against a municipality a perceived favorable attitude of potential jurors toward their towns does not constitute cause for a change of venue. *See, e. g., Powell v. City of Ouray*, 32 Colo.App. 44, 507 P.2d 1101, 1104 (1973); *Gouker v. Winnebago County Bd. of Supervisors*, 37 Ill.2d 473, 228 N.E.2d 881 (1964). In a somewhat different context it has been held that a trial court in a drug prosecution properly refused to honor a challenge to a juror who stated that he believed a police officer would tell the truth and would not intentionally lie. *State v. Amodei*, 222 Kan. 140, 563 P.2d 440, 443 (1977).

25. Several courts have denied motions to change venue made by traditionally unpopular defendants. *A. C. Ferrellgas Corp., Inc. v. Phoenix Insurance Co.*, 187 Kan. 530, 358 P.2d 786, 790 (1961) (insurer sued on policy for wind damage in county where hundreds of similar claims were pending against the defendant); *Arkansas Louisiana Gas Co. v. Ackley*, 410 P.2d 35, 36–37 (Okla.1965) (pipeline sued in county where general hostility was alleged as a result of the low prices it offered to landowners for rights-of-way).

26. *Cf. State v. White*, 60 Wash.2d 551, 374 P.2d 942, 953 (1962), *cert. denied* 375 U.S. 883, 84 S.Ct. 154, 11 L.Ed.2d 113 (1963); *State v. Kerr*, 14 Wash.App. 584, 544 P.2d 38, 42 (1975) (juror disqualification).