**Barrow KANAYURAK, Personal Representative of the Estate of Lillian Kanayurak, Deceased, Appellant,**

v.

**NORTH SLOPE BOROUGH, Appellee.**

No. 7278.

Supreme Court of Alaska.

Feb. 3, 1984.

William J. Donohue, Kennelly, Azar & Donohue, P.C., Anchorage, for appellant.

Paul A. Barrett, Winston S. Burbank, Call, DeWitt, Barrett & Burbank, Fairbanks, for appellee.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MATTHEWS, Justice.

This suit concerns the suicide of Lillian Kanayurak, a 42 year old Eskimo woman, who was incarcerated in the North Slope Borough Public Safety Building. Barrow Kanayurak, as personal representative of the estate of the deceased, brought suit against the North Slope Borough alleging that Borough employees were negligent for not preventing Lillian Kanayurak's suicide. The superior court, Judge Hodges presiding, granted the Borough's motion for summary judgment. We find genuine issues of material fact which preclude summary judgment and reverse.

### I.

Lillian Kanayurak was taken into protective custody for public intoxication at approximately 9:04 a.m. on December 20, 1977 by Officers Brown and Wood of the North Slope Borough Department of Public Safety. She was picked up in the lobby of the Top of the World Hotel in an apparent intoxicated condition, smelling very strongly of alcohol and needing assistance to stand and walk. She was subsequently transported to the North Slope Borough Department of Public Safety Building in Barrow, Alaska.

At approximately 11:40 a.m. Officer Brown checked Kanayurak's cell and discovered that she had hung herself from the cell's wire mesh ceiling with her sweater. Resuscitation efforts failed and Kanayurak was pronounced dead on arrival at the North Slope Borough Public Health Service Hospital. The autopsy concluded that Kanayurak died as a result of asphyxiation due to the hanging. Her blood alcohol level was measured at .246%.

Prior to her suicide, Kanayurak had been screaming that someone should locate and check on her two children. The police assured her that they were being checked on. Officer Christensen stated that she then calmed down; however, another employee stated that Kanayurak continued to plead for help for her children. Because her screaming and shouting was disrupting work in the office, Director of Public Safety Moeller closed the door to the cell area to muffle the noise.

Moeller was apparently aware at that time that one of Kanayurak's sons had been stabbed to death approximately four months earlier, that another son had burned to death in a fire approximately two months earlier, that two or three months earlier she had been divorced, and that two or three weeks earlier Kanayurak's mother had died. Moeller also stated that there had been 15 to 20 suicide attempts during that calendar year in the North Slope Borough Public Safety Building.

The cell area where Kanayurak was held was equipped with video monitors which the dispatcher used to view the prisoners. However, the camera monitoring the cell which Kanayurak occupied was partially blocked by a metal bar of the cell so that visibility in the upper two-thirds of the cell was very poor. As Kanayurak was hanging, the dispatcher could see her legs but not her feet or head. She appeared to be sitting down to the dispatcher.

Barrow Kanayurak brought this action pursuant to the Alaska Wrongful Death Act, AS 09.55.580, against the North Slope Borough and the State of Alaska.[1] The superior court granted the Borough summary judgment as to liability on June 14, 1982. The record does not reflect the basis for the court's ruling, but the Borough had argued that it should prevail (1) because it had no notice that Kanayurak would attempt suicide, and (2) because Kanayurak's death resulted from her own intentional conduct. After his petition for reconsideration was denied, Kanayurak filed a motion for entry of final judgment on August 10, 1982. This motion was granted on September 28, 1982, and on October 13th appellant filed a notice of appeal.

## II. TIMELINESS OF THE APPEAL

■ The Borough argues that Kanayurak's appeal is untimely because it was not filed within thirty days from the entry of judgment as required by Appellate Rule 204(a)(1).[2] The Borough construes the June 14, 1982 order of summary judgment as an entry of final judgment. We disagree.

Civil Rule 54(b)[3] provides that when a court disposes of the issues involving one party in a multi-party suit, this determination is subject to revision, and thus is not appealable, until the court certifies its determination as final or makes a decision that disposes of the claims of all parties. *Johnson v. State*, 577 P.2d 706, 709 (Alaska 1978). *Accord* 6 J. Moore, *Moore's Federal Practice* § 54.28[2], at 369 (2d ed. 1983); 10 C. Wright, A. Miller & N. Kane, *Federal Practice and Procedure* § 2656, at 47 (2d ed. 1983).

---

1. The complaint alleged that the State was negligent in the design and manufacture of the cell.

2. Appellate Rule 204(a)(1) states:
   The notice of appeal shall be filed within 30 days from the date shown in the clerk's certificate of distribution on the judgment appealed from.

3. Civil Rule 54(b) states:
   *Judgment Upon Multiple Claims or Involving Multiple Parties.* When more than one claim for relief is presented in a action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all of the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

The June 14, 1982 summary judgment order dismissed Kanayurak's cause of action as to the Borough, but not as to the State of Alaska. Under Civil Rule 54(b), Kanayurak could not have appealed this order until his motion for entry of final judgment was granted on September 28, 1982. Thus, his notice of appeal filed on October 13, 1982 was timely under Appellate Rule 204(a)(1).

## III. INTRODUCTION OF POLICE INVESTIGATIVE REPORT

Kanayurak argues that the trial court should have considered a police report prepared by Alaska State Trooper Flothe which detailed the results of his investigation of the suicide. Statements in this report tended to refute affidavits offered by the Borough which disclaimed any notice by Borough employees of Kanayurak's suicidal tendencies. The Borough contends that since the statements in the report were not made under oath they cannot be used to form the basis of a grant or denial of summary judgment. We hold that the trial court should have considered the majority of the statements in this report,[4] since these statements would have been admissible at trial.

■ Civil Rule 56(c) states that in considering a motion for summary judgment, "[j]udgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, *and admissions on file*, together with the affidavits, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." (Emphasis added) Moore's *Federal Practice* interprets this language as allowing the consideration of any material which "may properly be treated as an admission of a party." 6 J. Moore, *Moore's Federal Practice* § 56.-11(1–5), at 56–201 (2d ed. 1982); *see also Miller v. City of Fairbanks*, 509 P.2d 826, 829 (Alaska 1973) ("In attempting to satisfy their respective burdens [on a motion for

summary judgment], the parties may utilize pleadings, affidavits, and any other materials otherwise admissible in evidence."); 10 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2722, at 54 (2d ed. 1983).

> Evidence Rule 801 provides in part that:
> (d) *Statements which are not hearsay.* A statement is not hearsay if
> . . . .
> (2) *Admission by party opponent.* The statement is offered against a party and is ... (c) a statement by a person authorized by him to make a statement concerning the subject, or (d) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship....

The statements of Jessie Larson and Clayborn Tunik were not admissible since these persons were not Borough employees. Every other statement recorded in Investigator Flothe's report is a statement made by an employee of the North Slope Borough concerning a matter within the scope of his or her employment. Thus, these statements are admissions of a party opponent under Evidence Rule 801(d)(2)(c) and (d), and should have been considered by the trial court in ruling on the summary judgment motion. Since admissions need not be sworn, the fact that these statements were unsworn is immaterial.

■ The Borough argues that even if the statements in the police investigative report were admissible as admissions of a party opponent, Kanayurak failed to establish sufficient foundation that any agency relationship existed between the Borough and the persons whose statements were taken. The record indicates that the statements in the report were made for the most part by the same people whose affidavits were presented by the Borough in support of its motion for summary judgment. These affidavits establish the necessary agency relationship.[5] Statements by Offi-

---

4. The record does not indicate whether the statements were considered by the trial court.

5. For example, Kim Moeller's affidavit states:
   I was the Director of the North Slope Borough

cer Brown and Ruth Bullard, a dispatcher, do not fit into this category. However, the fact of employment of these two individuals with the Borough, as well as the fact that they had contact with Ms. Kanayurak in the scope of their employment, is reflected in the affidavit of the Borough's attorney, Paul Barrett. Further, Trooper Flothe gave sworn testimony at the summary judgment hearing which verified the employment relationship expressed in the statements. [Tr. 12] Thus, the statements were appropriate for consideration on summary judgment.

## IV. PROPRIETY OF THE SUMMARY JUDGMENT ORDER

The Borough argues that the summary judgment order dismissing the Kanayurak cause of action should be affirmed because (1) the Borough had no notice of Kanayurak's suicidal tendencies and therefore was under no duty to prevent her suicide, and (2) Kanayurak's suicide was an intentional act which would preclude liability in any event.

■ The question of what duty is owed by a jailer to a prisoner [6] has been previously addressed by this court. In *Wilson v. City of Kotzebue*, 627 P.2d 623 (Alaska 1981) we held that a jailer owes a duty to the prisoner to exercise reasonable care for the protection of his life and health. *Id.* at 628. This duty to protect the prisoner's health and safety encompasses a duty to prevent even self-inflicted harm assuming that such harm is reasonably foreseeable.[7] *Id.* at 631.

> Department of Public Safety at the time that Ms. Lillian Kanayurak committed suicide in the Barrow Jail....

**6.** See generally Comment, *Custodial Suicide Cases: An Analytical Approach to Determine Liability for Wrongful Death,* 62 B.U.L.Rev. 177 (1982); Comment, *Civil Liability for Causing or Failing to Prevent Suicide,* 12 Loy.L.A.L.Rev. 967 (1979), Annot.; *Civil Liability of Person or Jail Authorities for Self-Inflicted Injury or Death of Prisoner,* 79 A.L.R.3d 1210 (1977).

■ In the present case the Borough police had reason to believe that Kanayurak was severely depressed. They knew that in the previous few months one of her sons had been burned to death, another son had been stabbed to death, she had been divorced, and her mother had died. Furthermore, shortly before her suicide, Kanayurak pled for assistance in locating her other two children, and at least one employee stated that she continued to do so despite assurances from the police that the children were being attended to.

Kanayurak offered expert testimony on the question of foreseeability. In an affidavit, submitted for Kanayurak, Leo R. Ingle, M.D.[8] stated:

> The suicide of Lillian Kanayurak was foreseeable. A major cause of death of Eskimos in rural Alaska is suicide. Almost all these suicides occur while intoxicated. In the great majority of cases, no direct warning is given.
>
> ....
>
> Lillian Kanayurak was confined in an environment that facilitated suicide. Circumstances that caused the morbid state of mind resulting in her impulsive suicide included (a) confinement, (b) humiliation, (c) fear for her children and (d) isolation. These circumstances are particularly damaging to the Eskimo woman.

Cecil Johnson, the Chief of Police of Nome from 1975 through 1978, testified in an affidavit that:

> It is my opinion that Lillian Kanayurak should have been under constant observation. This is because numerous intoxicated persons in Artic areas attempt to commit suicide when they are incarcerat-

**7.** See, e.g., *The Vienneau v. Shanks,* 425 F.Supp. 676, 679–80 (D.Wis.1977); *Belen v. Harrell,* 603 P.2d 711, 713 (N.M.1979); *Falkenstein v. Bismarck,* 268 N.W.2d 787, 791 (N.D.1978); *Dezort v. Hinsdale,* 35 Ill.App.3d 703, 342 N.E.2d 468, 472–73 (1976); *Guice v. Enfinger,* 389 So.2d 270, 271 (Fla.Dist.Ct.App.1980).

**8.** Dr. Ingle is a licensed psychiatrist in Alaska and California, director of mental health services in California and Nome, and has two years experience in providing psychiatric services to Eskimos in the Norton Sound area.

ed in jails. This fact should be known to anyone who works in law enforcement dealing with intoxicated persons.

David Lowe, a former Alaska State Trooper and Chief of Police in Galena and Unalaska, stated in an affidavit that:

> From the report, it appears that Mrs. Kanayurak was taken into custody at a time when she was highly intoxicated, and also at a time when she was greatly concerned about the welfare of her children. In my opinion, the agents of the North Slope Borough should have been on notice that Mrs. Kanayurak might attempt to commit suicide.

Given the above evidence we believe that a genuine issue of material fact existed as to whether the Borough had reason to anticipate that Kanayurak would attempt suicide.[9]

■ The Borough's second argument is that the grant of summary judgment was proper because Kanayurak's suicide was an intentional act which would preclude liability. We stated in *Wilson* that:

> The general rule is that voluntary intoxication does not relieve one from liability for the consequences of his intentional or negligent act, and one who becomes intoxicated is held to the same standard of conduct as if he were sober. This rule has been held inapplicable, however, in the case of one who is so intoxicated, and whose mental and physical faculties are so impaired, that he is incapable of exercising due care for himself, where he is in the custody of another who is charged with the duty of caring for his safety. *There have been numerous decisions involving ... prisoners, which have held that recovery for self-inflicted harm is not barred where the plaintiff was incapable of exercising due care by virtue of his ... intoxication. In such cases, if the defendant has or should have knowledge of the plaintiff's condition, it may be found negligent if it violated its duty of exercising due care for the plaintiff's health and safety, for such duty encompasses the duty to prevent reasonably foreseeable acts involving an unreasonable risk of harm.*

The evidence submitted in this case regarding Wilson's conduct reasonably lent itself to either of two conclusions: (1) Wilson committed an intentional tort, injuring himself in the process; or (2) Wilson was so intoxicated as to be incapable of acting intentionally. The first conclusion bars Wilson's recovery regardless of any negligence on the part of Kotzebue, for a person may not recover for injuries resulting from his own intentional conduct.... *The second conclusion compels the inquiry of whether the defendant had notice of Wilson's condition, and eliminates the issue of Wilson's responsibility for his acts.*

*Id.* at 630–31 (Emphasis added) (Footnotes omitted).[10]

We stated in *Wilson* that if the jailer is aware that the prisoner is intoxicated when

---

**9.** Also of importance is the evidence that there had been 15 to 20 suicide attempts in the Borough facility in 1977 prior to Kanayurak's suicide.

**10.** *See, e.g., Padula v. State,* 48 N.Y.2d 366, 422 N.Y.S.2d 943, 398 N.E.2d 548 (1979) (Heroin addicts who drank printing fluid containing methyl alcohol, which was clearly marked as poisonous, not guilty of contributory negligence because unable to resist temptation to ingest euphoria-inducing substance); *Dezort v. Village of Hinsdale,* 35 Ill.App.3d 703, 342 N.E.2d 468 (1976) (Intoxicated prisoner who committed suicide not guilty of contributory negligence if incapable of exercising due care for his own safety); *Thornton v. City of Flint,* 39 Mich.App. 260, 197 N.W.2d 485, 489 (1972) (Act of plaintiff prisoner, who was chronic alcoholic suffering from delirium tremens, of diving from top bunk of his cell, "although 'intentional,' may not have been one of free volition," and question of whether plaintiff could recover was therefore for the jury); *Paris G.N.R. Co. v. Robinson,* 140 S.W. 434, 436 (Tex.1911) (The question of contributory negligence cannot arise when the undisputed evidence shows the passenger to be mentally or physically incapable of self protection, and where the railroad company has knowledge of such condition when it accepts him as a passenger.) *See also Barlow v. City of New Orleans,* 257 La. 91, 241 So.2d 501, 505 (1970):

> While it is true, as a general rule, that voluntary intoxication does not relieve one from negligent conduct or serve to relax the requirement which is imposed upon a person to exercise due care for his own safety ... this

taken into custody, the jailer must take more precautions for the safety of the prisoner than would be required in the case of an ordinary, sane, sober prisoner in control of his mental and physical facilities. *Id.* at 627, 628.[11]

Kanayurak was taken into custody under AS 47.37.170(b) which allows detention to protect the health or safety of a person "incapacitated by alcohol" in a public place. AS 47.37.170(j) states in part:

> For purposes of (b) of this section, "incapacitated by alcohol" means a person who, as the result of consumption of alcohol, is rendered unconscious or has his judgment or physical mobility so impaired that he cannot readily recognize or extricate himself from conditions of apparent or imminent danger to his health or safety.

At the time of her suicide Kanayurak had a blood alcohol level of .264%. Her speech was slurred to the point that she was difficult to understand. She had difficulty in walking, and had to hold the wire mesh on the cell to support herself. Based on this evidence, a genuine issue of fact existed as to whether Kanayurak was incapable of exercising due care by virtue of her intoxication.

The summary judgment issued in favor of the North Slope Borough by the trial court is REVERSED.

rule is subject to the exception that, where the person is in such a helpless state of intoxication that he is unable to take care of himself and is, as in this case, confined under arrest, recovery for injuries he has received emanating from a danger to which he is exposed, which is attributable partially to his unconscious act, but against which the defendant should have protected him, is not barred by contributory negligence.

11. *See, e.g., Falkenstein v. City of Bismarck,* 268 N.W.2d 787 (N.D.1978); *Griffis v. Travelers Ins. Co.,* 273 So.2d 523 (La.1973); *Daniels v. Anderson,* 195 Neb. 95, 237 N.W.2d 397 (1975); *Thom-* *as v. Williams,* 105 Ga.App. 321, 124 S.E.2d 409 (1962); *Shuff v. Zurich-American Ins. Co.,* 173 So.2d 392 (La.App.1965). In *Wilson* we noted that this does not mean that the duty of reasonable care is changed:

> While it is true that certain special relationships, such as that between jailer and prisoner, require the exercise of greater care than others, this is simply another way of saying that the amount of care required must be commensurate with the amount of risk or responsibility involved, *i.e.,* it is what is reasonable and prudent *under the circumstances. Id.* at 628–29 (emphasis in original).