STATE of Alaska, DEPARTMENT OF CORRECTIONS, Appellant/Cross–Appellee,

v.

Garry JOHNSON, Appellee/Cross–Appellant.

Nos. S–8669, S–8670.

Supreme Court of Alaska.

May 5, 2000.

Rehearing Denied June 21, 2000.

Thomas J. Slagle, Assistant Attorney General, and Bruce M. Botelho, Attorney General, Juneau, for Appellant and Cross–Appellee.

Thomas V. Van Flein and Craig F. Stowers, Clapp, Peterson & Stowers, Anchorage, for Appellee and Cross–Appellant.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

FABE, Justice.

## I. INTRODUCTION

The State appeals a jury verdict in favor of Garry Johnson, a former inmate at the Ketchikan Correctional Center, for damages he suffered when a swinging door knocked him down a stairway. Because the superior court incorrectly instructed the jury on the duty of care that the State must exercise when building a jail, we reverse. Although we remand on the issue of whether the State breached its duty to Johnson, we find no error tainting either the jury's finding that Johnson's fall caused his injuries or its calculation of damages. We therefore remand for a new trial limited to the issue of whether the State breached its duty to exercise reasonable care in the construction of the Ketchikan jail.

## II. FACTS AND PROCEEDINGS

One evening in February 1994 Garry Johnson was returning to his cell at the Ketchikan Correctional Center. As he climbed to the landing at the top of the stairs, he turned to speak to a fellow inmate. At this precise moment, his cell mate, Thomas Coen, opened the cell door, striking Johnson and knocking him off the landing and down the stairs. Johnson fell to the base of the stairs, where he lay unconscious.

Johnson has suffered severe medical hardship since the accident. Dr. Susan Hunter–Joerns testified that the fall damaged the sacral root nerves that control urinary, bowel, and erectile function. The accident has impaired these functions severely and permanently. Johnson must use a catheter and wear adult incontinence protection devices for the rest of his life.

Johnson sued the State for his injuries. The State filed a third-party complaint against Thomas Coen in an attempt to assign a portion of the fault to him for opening the door.

Less than a month before trial, and after discovery had closed, the State sought an independent medical evaluation (IME)of Johnson. Despite the close of discovery, Johnson's counsel cooperatively agreed to allow the IME but did not waive Johnson's right to have counsel present at the examination. Although the State scheduled the IME for a date several weeks later, it did not reveal this information to Johnson's counsel, purportedly because of security concerns about transporting a prisoner. The State made no effort to notify Johnson's counsel of the scheduling for the IME until one-half hour before the exam took place. Even then, counsel for the State just left a voice-mail message for Johnson's attorney. That message, however, concerned only general matters and failed even to mention the impending IME. The IME entailed many invasive and painful procedures; yet Johnson's counsel did not learn of it until afterward. After a hearing on the issue, the superior court excluded the testimony of the examining physician, Dr. John Keene.

At trial Johnson contended that the stair landing from which he fell was too short. At the time the State received the building permit for the jail in 1980, Alaska had adopted the 1970 version of the Uniform Building Code (UBC). The 1970 UBC required forty-eight-inch-deep stair landings, and the jail complied with that requirement. But state law requires the state's public buildings to comply with local building codes as well.[1] Before the State received its building permit, Ketchikan had adopted the 1979 UBC, which required sixty-inch stair landings—a full foot longer than the landing in front of Johnson's cell. Prior to Johnson's accident, however, both the State and Ketchikan adopted the 1991 UBC, which required only forty-four-

---

1. See AS 35.10.025.

inch landings. All of the trial experts agreed that the landing complied with the 1991 UBC in effect at the time of the accident.

Johnson filed a pretrial motion, seeking a ruling that the State's construction of the landing was negligent per se. The State filed a cross-motion, arguing that the building code effective at the time of injury defined the standard of care. The superior court ruled that the State violated the Ketchikan building code that was in effect when the building permit was issued, but refused to give the requested negligence per se instruction. Instead, the court ruled that "the finder of fact may consider the State's violation of [the] 1979 UBC ... as evidence of negligence." Despite the pretrial ruling, the actual instruction given to the jury stated: "You are instructed to consider the State's violation ... as evidence of negligence."

The trial began on October 13, 1997 and lasted almost two weeks. At trial the parties disputed the standard of care owed by a jailer to a prisoner. The State asserted that the standard required the jailer only to exercise "reasonable care for the safety of his prisoners." But the court instructed the jurors that the jailer owed Johnson the duty of "utmost care."

The State also objected repeatedly to Johnson's closing argument. In the argument, Johnson's counsel told a fictional story in the first person about an accident that his own wife had allegedly suffered. The described facts of this incident were almost identical to those of Johnson's accident. Upon each of the State's three objections, the court instructed the jury that plaintiff's counsel was using an analogy. Johnson's counsel admitted as much but only at the story's conclusion. The State argues that this argument had no support in the evidence and that allowing it constituted reversible error.

The State also argues that the court erred when it removed the question whether John-

son suffered from "severe physical impairment" from jury consideration and ruled that the statutory $500,000 cap on non-economic damages did not apply to Johnson.

The jury found the State one hundred percent negligent, assigning no comparative negligence to Johnson or his cell mate Coen. The jury awarded $2,050,000 in damages, including $1,250,000 in past and future non-economic damages. After the court added attorney's fees and interest, it entered a final judgment of $2,356,292.55. The superior court rejected the State's motion for a new trial, and the State appeals.

In his cross-appeal Johnson disputes the superior court's failure to take judicial notice of the Occupational Safety and Health Administration (OSHA) regulations that he claims show that the jail violated federal safety standards.

### III. STANDARD OF REVIEW

■ Assessing the validity of jury instructions involves questions of law, which are subject to our independent review.[2] An error in jury instructions will be grounds for reversal only if it caused prejudice.[3]

■ We review the superior court's exclusion of expert witnesses for an abuse of discretion.[4] A trial court abuses its discretion if exclusion of an expert "determin[es] a central issue in the litigation," unless the party seeking to admit the expert acted willfully to gain an advantage in the litigation.[5]

### IV. DISCUSSION

A. The Superior Court Committed Prejudicial Error When It Instructed the Jury that the State Owed Johnson a Duty to Exercise the Utmost Caution.

■ The standard in Wilson v. City of Kotzebue [6] requires the State to exercise "reasonable care for the protection of [the

2. See Sever v. Alaska Pulp Corp., 931 P.2d 354, 361 n. 11 (Alaska 1996).

3. See Coulson v. Marsh & McLennan, Inc., 973 P.2d 1142, 1150 n. 21 (Alaska 1999).

4. See Fairbanks N. Star Borough v. Lakeview Enters., Inc., 897 P.2d 47, 58 (Alaska 1995).

5. Sykes v. Melba Creek Mining, Inc., 952 P.2d 1164, 1170 (Alaska 1998) (quoting Alaska R. Civ. P. 37(b)(3)).

6. 627 P.2d 623 (Alaska 1981).

prisoner's] life and health." [7] Because prisoners often cannot avail themselves of opportunities for self-protection, the reasonable care standard periodically requires the jailer to exercise more then ordinary care.[8] The "amount of risk or responsibility" involved in holding a prisoner may dictate that a jailer must exercise the "utmost caution" to "assist a prisoner who is *in danger.*" [9] Acknowledging this duty as utmost caution is really just a way of restating the requirement that the jailer must exercise reasonable care under the circumstances.[10]

■ Reasonable care in these circumstances did not require the State to exercise the "utmost caution" because Johnson was not in any unique danger and was able to protect himself. The superior court instructed the jury:

> One who is required by law to take or who voluntarily takes the custody of another, under circumstances which deprive the other of his normal opportunities for protection, has a duty *to exercise the utmost caution* to protect that person against unreasonable risk of harm. Such a duty encompasses the jailer's duty to guard against risk of injury to his prisoners.

(Emphasis added.) In this case, however, Johnson had an opportunity to protect himself. Johnson was neither incapacitated nor did the terms of his custody impair his ability to exercise caution on the stairway. He had the same opportunity as any other stairway user, such as a guard or other prison employee, to avoid being knocked off the landing by the swinging door. Being in custody did not place Johnson "in danger" that would have triggered the State's duty to exercise more then ordinary care.[11]

This case does not present any of the concerns that led us in *Wilson* to characterize the standard of care as one of "utmost caution." [12] In *Wilson* [13] and *Kanayurak v. North Slope Borough,*[14] we pointed to circumstances that would justify the "utmost caution" instruction. In these cases we held that the jailer must exercise a higher degree of care when the jailer knows or reasonably should have foreseen that the prisoner was incapacitated, suicidal, or otherwise "in danger." [15] Because Johnson could have exercised the same amount of care as any other stairway user, the superior court should not have instructed the jury that the State owed him the utmost care.[16]

Moreover, the State should employ the same safety standards for stairways in all state buildings. The need for safety in a state building's design is not peculiar to a prison. And the fact that the State compels Johnson to reside in the prison does not in itself warrant a heightened duty. If the State owed the utmost care to those it com-

7. *Id.* at 628.

8. *See id.*

9. *Id.* (emphasis added).

10. *See id.; see also* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 34 (5th ed.1984).

11. *Wilson,* 627 P.2d at 628.

12. *Id.* at 628–29. We reserve the question of precisely which circumstances justify the "utmost caution" instruction.

13. *Id.* In *Wilson* an intoxicated prisoner started a fire in his cell, but the jailers failed to confiscate his lighter. The second fire set by the prisoner caused his injuries. *See id.* at 626.

14. 677 P.2d 893, 897 (Alaska 1984). In *Kanayurak* the prisoner was intoxicated and experiencing hardship in her family life. *See id.* at 894–95.

In reversing a grant of summary judgment, we held that a genuine issue of material fact existed as to whether the jailer should have recognized that the prisoner was prone to commit suicide, thus holding him to a duty to take action to prevent it.

15. *Wilson,* 627 P.2d at 628–29; *Kanayurak,* 677 P.2d at 898–99. To justify requiring more than ordinary care in some circumstances, the *Wilson* court analogized to the special relationship between a common carrier and its passengers. This analogy is only warranted in special situations when circumstances unique to prisoners and known to or reasonably foreseeable by the jailer endanger the prisoner. *See Wilson,* 627 P.2d at 628.

16. Another jurisdiction requires a jail designer to build the jail "safe for its intended use." *Tittle v. Giattina, Fisher & Co., Architects, Inc.,* 597 So.2d 679, 681 (Ala.1992); *see also La Bombarbe v. Phillips Swager Assocs., Inc.,* 130 Ill.App.3d 896, 86 Ill.Dec. 28, 474 N.E.2d 942, 944 (1985).

pelled to be in a particular building, then the heightened duty would extend to individuals subpoenaed to appear at a courthouse [17] or students required to attend school.[18] We do not hold the State to the duty of utmost care in either of these circumstances.

▮ Because Johnson was not "in danger" as contemplated by the court in *Wilson*, the situation did not permit an instruction more stringent than reasonable and prudent care under the circumstances. The instruction made a verdict for the plaintiff more likely; therefore we reverse and remand for a new trial.

▮ We now proceed to address the other issues on appeal in order to provide guidance to the trial court on remand. In doing so we conclude that the trial court committed no error that would affect the jury's finding that Johnson's fall caused his injuries or its calculation of damages. When no error taints a portion of the jury's verdict and we believe the interests of justice and judicial economy dictate, a remand for a new trial may be limited to the issues affected by the error.[19] Accordingly, on remand the trial should be limited to the issue of whether the State was negligent in designing and building the stairway to Johnson's cell.

B. *The Superior Court Acted Within Its Discretion When It Excluded Dr. Keene's Testimony.*

▮ The examination that Dr. Keene conducted without Johnson's counsel present violated Johnson's right to have an attorney present during a Rule 35 exam.[20] We have recognized that right explicitly.[21] A Rule 35 exam is "often a critical part" of the litigation process,[22] making this right more than a procedural protection.[23] Having counsel present is a right that may protect the examinee from invasive, painful procedures and questions that exceed the proper scope of the exam. The presence of counsel may also facilitate future cross-examination of the examining physician.[24] Because Johnson had a right to counsel during a Rule 35 examination, we give great deference to the trial court's sanction protecting it.

The exclusion of Dr. Keene's testimony and his exam report was an appropriate sanction under Rule 37(b)(3).[25] The State only sought an IME after discovery had

17. *See* AS 09.50.010(10) (allowing a judge to hold people who disregard a subpoena in contempt of court); Alaska R.Crim. P. 17(g).

18. *See* AS 14.30.010 (requiring children aged 7 to 16 to attend school).

19. *See Fancyboy v. Alaska Village Elec. Coop., Inc.*, 984 P.2d 1128, 1136 (Alaska 1999); *General Motors Corp. v. Farnsworth*, 965 P.2d 1209, 1222–23 (Alaska 1998); *Sturm, Ruger & Co. v. Day*, 615 P.2d 621, 624 (Alaska 1980).

20. Alaska R. Civ. P. 35 (authorizing courts to order a party to submit to a physical or mental exam upon a showing of good cause and proper notice to the party to be examined, when the physical or mental condition of a party is at issue).

21. *See Langfeldt–Haaland v. Saupe Enters., Inc.*, 768 P.2d 1144, 1147 (Alaska 1989) ("We align Alaska with those authorities which allow plaintiff's counsel to attend and record, as a matter of course, court-ordered medical examinations in civil cases.").

22. *Id.* at 1146.

23. The State has attempted to distinguish *Langfeldt–Haaland* because the examination was not court-ordered but by agreement of the parties. It is unclear why this distinction is relevant, especially in light of Rule 35(b)(3), which extends 35(b)'s other protections to examinations by agreement.

24. *See Langfeldt–Haaland*, 768 P.2d at 1145.

25. This rule, which governs the imposition of discovery sanctions, provides:

> Prior to making an order ... the court shall consider
> (A) the nature of the violation, including the willfulness of the conduct and the materiality of the information that the party failed to disclose;
> (B) the prejudice to the opposing party;
> (C) the relationship between the information the party failed to disclose and the proposed sanction;
> (D) whether a lesser sanction would adequately protect the opposing party and deter other discovery violations; and
> (E) other factors deemed appropriate by the court or required by law.
> The court shall not make an order that has the effect of establishing or dismissing a claim or defense or determining a central issue in the litigation unless the court finds that the party acted willfully.

closed and the trial date approached. Johnson's counsel nevertheless agreed to allow the examination but expressed his desire to be present. Despite this request, the State scheduled and conducted the exam, failing to provide any notice to Johnson's counsel that it would be taking place.

The State's reliance on a Department of Corrections policy requiring the transportation of prisoners to be confidential does not justify the State's failure to notify counsel. This policy is only a broad guideline, providing that "[p]risoner transportation will be treated as confidential information." The State presented no evidence that informing Johnson's counsel would create a security risk. The State routinely informs attorneys of their clients' transportation while keeping this information from the public for security reasons. A simple request of counsel to keep the time and place confidential would have sufficed to allay the State's concerns.

The State concedes that it did not attempt to contact Johnson's attorney until thirty minutes before the exam. Even then the voice mail that the State left with Johnson's counsel failed to mention the imminent exam. Johnson's counsel did not learn of the exam until after it had taken place. The State's conduct exhibited utter disregard for Johnson's right to have an attorney present.

The State's discovery violation is especially egregious considering the invasive, painful nature of the exam. Dr. Keene performed an "anal wink" test, in which he poked the tissue surrounding Johnson's anus with a sharp medical instrument. Dr. Keene also performed a cystometrogram, in which he inserted a tube into Johnson's penis and filled his bladder with fluid to the point of causing severe pain.

Moreover, the court's ruling did not preclude the State from offering evidence on the issue of causation. The State cites *Sykes v. Melba Creek Mining, Inc.*[26] for the proposition that a showing of willfulness is necessary

under Rule 37(b)(3) when exclusion of a witness effectively determines an issue. Our decision in *Sykes* is not controlling in this case, however, because the trial court's decision was not issue determinative. The State could have procured other evidence on the causation issue, including the testimony from one of the many doctors who has examined Johnson.

Because Dr. Keene's exam violated Johnson's substantive rights and its exclusion did not determine an issue against the State, we conclude that the superior court acted within its discretion when it condemned the State's deliberate conduct, excluded Dr. Keene's testimony, and refused to allow another invasive exam.

C. *On Remand the Superior Court Should Instruct the Jury to Consider Violation of the 1979 Building Code as Evidence of Negligence.*

The parties have disputed the importance of the State's violation of the 1979 UBC, which was effective at the time of construction but had been relaxed before Johnson's injury. The trial court correctly resolved this issue before trial when it concluded that "the finder of fact may consider the State's violation of 1979 UBC Sec. 3303(i) as evidence of negligence." But the State's proposed instructions state the law more accurately than that of the instruction that the superior court actually gave.

1. *The superior court correctly refused to issue a negligence per se instruction.*

Johnson argues that the superior court should have issued a negligence per se instruction. In determining whether a negligence per se instruction is appropriate, the trial court must conduct a two-step inquiry.[27] First, it must analyze "whether the conduct at issue is under the ambit of the statute according to the criteria set out in Restatement (Second) of Torts § 286."[28] Second,

---

**26.** 952 P.2d 1164, 1170 (Alaska 1998).

**27.** *See Cable v. Shefchik*, 985 P.2d 474, 477 (Alaska 1999).

**28.** Those criteria are:

The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part

upon a finding that an injury falls within the ambit of the statute, the trial court must decide whether to exercise its limited discretion to refuse the negligence per se instruction.[29] This discretion is appropriately exercised, however, when the law is obsolete:

> Obviously, cases will be relatively infrequent in which legislation directed to the safety of persons ... will be so obsolete, or so unreasonable, or for some other reason inapplicable to the case, that the court will take this position; but where the situation calls for it, the court is free to do so.[30]

Even if the 1979 UBC, which required sixty-inch landings, applied to the State at the time of construction, both Ketchikan and the State had repealed it at the time of injury. Because the applicable law had changed such that the State's purportedly negligent design now complied with the statute, the superior court acted appropriately when it denied the negligence per se instruction. As the superior court observed: "It would be absurd for this court to declare, through a finding of negligence per se ... that a 48 inch landing is not reasonable when in fact the standard for new construction at the time of the accident held that as little as 44 inches [was] an acceptable length for a landing...." We agree with the superior court's analysis and conclude that a negligence per se instruction was not appropriate.

This decision will not, as Johnson contends, spawn a flood of litigation over buildings that complied with old building codes but do not meet the current requirements. First, the grandfathering regulation states that conditions not in strict compliance with the amended building code may continue where they do not constitute a distinct hazard to life or health.[31] Second, we confine our holding that the appropriateness of the negligence per se instruction depends on the code at the time of injury to situations where amendments to the UBC bring a preexisting code violation into compliance.

Nor does our recent decision in *Cable v. Shefchik*[32] compel us to reach the conclusion that a negligence per se instruction was appropriate in this case. In *Cable* we held that the trial court abused its discretion when it did not issue a negligence per se instruction and merely submitted the violation as evidence of negligence.[33] But in *Cable* the general safety code provision that the defendant violated was in effect at the time of the accident.[34] In this case the State was not in violation of the UBC at the time of the accident. The landing's compliance with the current code justifies an instruction on the past violation as "evidence of negligence" rather then negligence per se.

Although Johnson's injury may have fallen within the ambit of the statute, the statute was obsolete at the time of injury. Thus, the court correctly refused to grant a negligence per se instruction.

> 2. *On remand the superior court should instruct the fact finder that it may consider the UBC violation as evidence of negligence.*

■ The State argues that although the superior court correctly ruled before trial that the jury "may consider the State's violation of [the] 1979 UBC ... as evidence of negligence," it improperly gave Instruction 32, which told the jury "to consider the State's violation of the 1979 U.B.C .... as evidence of negligence."[35] According to the

(a) to protect a class of persons which includes the one whose interest is invaded, and

(b) to protect the particular interest which is invaded, and

(c) to protect that interest against the kind of harm which has resulted, and

(d) to protect that interest against the particular hazard from which the harm results.

Restatement (Second) of Torts § 286 (1971); (quoted in *Cable,* 985 P.2d at 477 n. 2).

29. *See Cable,* 985 P.2d at 477.

30. *Northern Lights Motel v. Sweaney,* 561 P.2d 1176, 1184 (Alaska 1977) (quoting Restatement (Second) of Torts § 286 cmt. d).

31. *See* 13 Alaska Administrative Code (AAC) 55.030(a) (1998).

32. 985 P.2d 474.

33. *See id.* at 478–79.

34. *See id.* at 477–79.

35. Instruction 32 reads in its entirety:

State, the superior court reversed the law of the case by issuing what amounted to a negligence per se instruction despite its earlier ruling denying such an instruction.[36] While the superior court's pretrial ruling was correct, the instruction actually given amended and expanded the court's pretrial decision. Because the jury could have interpreted this instruction as compelling it to consider the UBC violation as evidence of negligence when it would be free either to accept or reject the evidence, the State's proposed instructions more accurately state the law.[37] On remand the trial court should issue an instruction that allows the jury either to accept or reject the UBC violation as evidence of negligence.

> You are instructed that at the time the Ketchikan Correctional Center was built, Alaska law under AS 35.10.025 provided as follows:
> A public building shall be built in accordance with applicable local building codes.... This section applies to all buildings of the state....
> ... [A]t the time of the facility planning and construction, the State was bound under AS 35.[1]0.025 to follow the local building codes of the City of Ketchikan.... Ketchikan's local building code includes Sec. 3303(i) of the 1979 Uniform Building Code which required that a landing to a stairway that had a door opening over it was to have a minimum length of five feet. Therefore, the landing in question was in violation of the 1979 Uniform Building Code.
> You are instructed to consider the State's violation of 1979 U.B.C. Sec. 3303(i) as evidence of negligence.
> This court has not determined as a matter of law, whether or not the violation of any building code by the State of Alaska was a proximate cause of injury to Mr. Johnson. That is for you to determine as the finder of fact.

**36.** Johnson argues that the State failed to object to Instruction 32. But the State did object to a negligence per se instruction. Because we conclude that Instruction 32 amounted to a negligence per se instruction, the State's objection was not waived.

**37.** The State's proposed Instruction 5 reads in pertinent part:
> There was a building code in effect for the City of Ketchikan and State of Alaska in 1982/1983 when the Ketchikan Correctional Center was constructed. It provides:
> 1979 Uniform Building Code § 3303(i).
> (i) **Change in Floor Level at Doors**.... Where doors open over landings, the landing shall have a length of not less than 5 feet.

### D. *The Superior Court Correctly Directed a Verdict Holding the Non-economic Damages Cap Inapplicable to Johnson Because He Suffered a Severe Physical Impairment.*

The superior court appropriately directed a verdict for Johnson on the issue of the applicability of the statutory cap on damages. Former AS 09.17.010 [38] imposes a $500,000 cap on non-economic damages unless the victim has suffered "severe physical impairment." [39] The question whether a plaintiff suffers from a severe physical impairment is one of fact, which would normally be presented to the jury.[40] In this case, however, the superior court appropriately removed the question from the jury because "reasonable persons could not differ in their judgment as to the facts." [41] The plaintiff

> If you decide it is more likely true than not true that the State of Alaska violated any part of this law, you may consider that fact along with all other evidence [including any evidence tending to show why the law was violated] in deciding whether under the circumstances of this case the defendant used reasonable care.
> (Brackets in original.) The State's proposed Instruction 6 reads in pertinent part:
> There was a building code in effect for the City of Ketchikan and State of Alaska in 1994 that applies to this case. It provides:
> 1991 Uniform Building Code § 3304(j)
> (j) **Landings at Doors**.... Landings shall have a length measured in the direction of travel of not less then 44 inches.
> If you decide it is more likely true than not true that the State of Alaska obeyed this law, you may still decide the State of Alaska is negligent if you decide that a reasonably careful person under circumstances similar to those shown by the evidence would have taken precautions in addition to those required by the uniform building code.

**38.** The legislature enacted AS 09.17.010 as part of the 1986 tort reform. *See* Ch. 139, § 1, SLA 1986. The legislature has subsequently modified the statute, but that modification is inapplicable here because it only applies to injuries occurring after August 7, 1997. *See* Ch. 26, § 1, SLA 1997.

**39.** AS 09.17.010 (1996).

**40.** *See, e.g., Owens–Corning v. Walatka*, 125 Md. App. 313, 725 A.2d 579, 585 (1999); *Lewis v. Krogol*, 229 Mich.App. 483, 582 N.W.2d 524, 526 (1998).

**41.** *Alaska Tae Woong Venture, Inc. v. Westward Seafoods, Inc.*, 963 P.2d 1055, 1062 (Alaska 1998) (quoting *Ben Lomond, Inc. v. Schwartz*, 915 P.2d 632, 635 (Alaska 1996)).

presented medical experts who testified that Johnson suffered from a severe physical impairment. The State presented no contrary evidence.

And although the State replies by listing the parts of Johnson's body that were not impaired or damaged by the accident, this argument ignores the overwhelming testimony that Johnson suffers from a severe physical impairment:

Q: Doctor, is Garry Johnson's condition, as you understand it, with regard to bowel, bladder, and erectile dysfunctions, is it permanent?

A: As far as we can tell, yes.

Q: Does it constitute physical impairment?

A: You bet. And ... people will put up with back pain fairly readily, and leg pain, or missing fingers ..., but when you start affecting their bowel, their bladder and their erectile [ ]function, you're real close to home. This is a major disability.

Q: And on a scale of mild, moderate to severe, how would you rate it?

A: Severe, he's lost the bowel and bladder and all ... erectile [ ]function, it can't get any worse than that.

The evidence was undisputed that Johnson has permanently lost urinary and bowel function. Johnson must use a catheter and wear an adult incontinence protection product every day for the rest of his life. Because permanently losing the normal use of a body system necessary for day-to-day life constitutes severe physical impairment,[42] the superior court properly removed this issue from the jury's consideration.[43]

E. *Johnson's Closing Argument Was Improper.*

 In closing argument Johnson's counsel gave a fictional account of an accident allegedly suffered by his wife. Johnson's counsel told the story in the first person and did not acknowledge it was untrue until he had concluded his account. The fictional accident was similar to that suffered by Johnson:

My wife and I ... took a trip to Juneau this past February, and we visited the state museum.... And when we went up ... this flight of stairs that led to an art gallery, and it was down kind of a narrow hall and they would have smaller art objects hanging on the wall....

. . . .

... [S]he was walking up the stairs ahead of me, and she got to the top of the stairs and I said honey, look, and I pointed down the hall because there were some really neat paintings hanging on the wall. And she stopped at the top of the landing and she turned and—because I had called to her, and she turned ... and unbeknownst to either of us, this door opened. And subsequently, I found out it was a really heavy metal door that swung open.... [I]t bumped her as she was standing, and she lost her balance and she fell down the stairs....

. . . .

And I ran to her ... and there was no response, but she was shaking and spasming and ... I was scared, I really was....

But I have a friend who's an engineer in Juneau, and I contacted him ... about the situation.....

. . . .

And I asked him ... if he'd look into this, and he said ... he would be happy to.... He got back to me and told me, that [this door violated the building code]....

And that brings up another subject, that's the subject of what's wrong with [my wife]. The doctors say she—well she's been urinating in a bag, using a catheter the entire time since this fall. And in

---

**42.** *See School Bd. of Nassau County, Fla. v. Arline,* 480 U.S. 273, 279–80, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987) (approving of the definition of "physical impairment" in 45 C.F.R. § 84.3(j)(2)(i) (1985)).

**43.** Because we have concluded that the non-economic damages cap does not apply to Johnson, we need not address Johnson's contention that the damages cap is unconstitutional. *See Municipality of Anchorage v. Anchorage Daily News,* 794 P.2d 584, 594 n. 18 (Alaska 1990).

order to go to the bathroom ... she has to use an enema.... And I don't know, could you look into this case for me, because this is what I'm dealing with.

The trial judge counteracted the misleading nature of the argument by telling the jury on three occasions that it was just an analogy. But without such admonitions, counsel's argument could have confused the jury, causing it to believe that the "facts" of the story were evidence in the case or that the State had negligently designed another state building. Although the use of analogies is certainly an approved technique for closing argument and may counteract prejudice toward an unsympathetic client,[44] Johnson's counsel could have avoided all possible confusion by positing the story as a hypothetical at the outset of closing argument. In the event that counsel for Johnson wishes to make a similar closing argument on retrial, the trial court should ensure that this happens.[45]

## V. CONCLUSION

The superior court erred when it instructed the jury that the State owed Johnson a duty of "utmost care." Because the jury could have found the State liable for violating the duty of "utmost care" but not liable under the appropriate "reasonable care" standard, the error was prejudicial. Consequently, we REVERSE and REMAND for a new trial. Because we find no error tainting the jury's verdict regarding causation and the calculation of damages, we limit the issue at the new trial to whether the State was negligent in designing and building the Ketchikan Correctional Center.

---

44. *See* Thomas Mauet, *Fundamentals of Trial Techniques,* 275, 277 (2d ed.1988).

45. On cross-appeal Johnson challenges the superior court's failure to take judicial notice of OSHA regulations that he claims show that the jail violated federal safety standards. The superior court appropriately exercised its discretion when it refused to take judicial notice of the OSHA regulations. The OSHA regulations are "duly published regulations of agencies of the United States." Alaska R. Evid. 202(c)(2). Accordingly, the court's decision to take judicial notice is governed by Rule 202(c), which grants the trial court discretion as to whether to take judicial notice when an attorney does not make a proper request. Because Johnson's counsel made no prior request, the trial court was free to take or refuse to take judicial notice.