B.R., Appellant,

v.

STATE of Alaska, DEPARTMENT OF CORRECTIONS, and Clarence Bullock, Appellees.

No. S–11438.

Supreme Court of Alaska.

Sept. 29, 2006.

James Alan Wendt, Anchorage, Law Offices of James Alan Wendt, Anchorage, for Appellant.

Venable Vermont, Jr., Assistant Attorney General, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for Appellees.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

BRYNER, Chief Justice.

## I.  INTRODUCTION

Clarence Bullock, a physician's assistant employed by the Alaska Department of Corrections, sexually assaulted a female inmate, B.R., while treating her at the Anchorage

Jail. B.R. sued the department for damages, alleging that it was liable as Bullock's employer, and also that it negligently hired and failed to adequately train its employees. The superior court granted summary judgment to the department, relying on an Alaska law that immunizes state agencies from liability for intentional wrongs such as assaults. We reverse. Although the intentional-tort immunity law prevents B.R. from recovering against the department on any theory asserting a breach of the department's duties as Bullock's employer, the immunity law does not bar a claim against the department for negligently breaching its duty to protect inmates from harm, a separate duty that does not arise from the department's role as Bullock's employer and that the department could breach regardless of Bullock's employment status. Because B.R.'s complaint appears to advance at least one claim based on this theory and could be amended to assert others as well, we hold that dismissal of B.R.'s complaint should not have been ordered.

## II. FACTS AND PROCEEDINGS

B.R., a federal prisoner housed at the state jail in Anchorage, complained about abdominal pain and visited the jail's medical center. Clarence Bullock, the on-duty physician's assistant, examined B.R. During the examination, Bullock sexually assaulted B.R. by penetrating her vagina in a manner that was not medically appropriate. B.R. reported the assault to state troopers, who opened an investigation.

B.R. experienced further abdominal pain and was sent back to the jail's medical center for additional treatment. Before going, she evidently asked the department for an escort to protect her from further mistreatment. Despite this request, Bullock performed another examination of B.R. and sexually assaulted her again. Although it is unclear whether anybody actually accompanied B.R. during her second visit to the medical center, the record indicates that another person—a nurse or B.R.'s escort—might have been in or near the examination room during B.R.'s second visit with Bullock.

After B.R. reported the second incident, the state charged Bullock with sexually assaulting her. He eventually entered a plea of no contest to one count of attempted sexual assault in the third degree.

B.R. sued the department, alleging that it was liable for Bullock's assault under the doctrine of respondeat superior; she also alleged that the department was liable for her injuries because it negligently hired Bullock and, "despite being aware of the potential impropriety between male employees and female inmates," it "failed to adequately train employees on this topic." B.R. further asserted that the department was "on notice that the training of correctional employees who interface with inmates was necessary" and that "[t]he failure of the . . . [department] . . . to adequately train employees on this issue caused the illegal and inappropriate behavior of Defendant Bullock."

The department moved for summary judgment. Relying on Alaska's statute barring suits against the state for claims arising out of assault and other intentional wrongs, the department argued that it could not be held liable for Bullock's assault. In advancing this immunity argument, the department focused on B.R.'s claims accusing it of negligently hiring and training Bullock:

[A] plaintiff cannot escape the bar to claims arising out of assault by pleading claims sounding in negligence, such as negligent hiring or negligent training. . . . Failure to bar these derivative negligence claims would eviscerate the purpose of the assault exception to the State's waiver of sovereign immunity. In every case arising out of an assault by a State employee the plaintiff will seek to circumvent the exclusion of assault claims by alleging that the State negligently failed to discover the employee's violent or deviant propensities during the hiring process . . . or that the State negligently failed to train the employee to suppress the violent or deviant propensities.

Although the language of B.R.'s complaint alleged a general failure to adequately train and supervise "employees on this topic"—an allegation broad enough to encompass employees other than Bullock—the depart-

ment's summary judgment memorandum failed to recognize or discuss this potentially broader aspect of B.R.'s claim.

The superior court granted the department's motion for summary judgment and dismissed B.R.'s complaint on the ground that it was barred by Alaska's intentional-tort immunity statute.

B.R. appeals.

## III. STANDARD OF REVIEW

■■■■ We review a grant of summary judgment de novo.[1] Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[2] The moving party has the "entire burden" of proving that it is entitled to summary judgment.[3] That is, unless the moving party points to undisputed facts or admissible evidence establishing a prima facie case entitling it to summary judgment as a matter of law, the opposing party has no obligation to produce evidence supporting its own position.[4]

## IV. DISCUSSION

B.R.'s complaint advanced claims against the department under several alternative theories: respondeat superior, negligent hire, and negligent failure to train employees. The question here is whether these claims are all barred as a matter of law by Alaska's intentional-tort immunity statute, AS 09.50.250(3). Under this law, the state is immune from any tort claim that "arises out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of pro-

cess, libel, slander, misrepresentation, deceit, or interference with contract rights."

The Alaska immunity statute's language closely tracks that of 28 U.S.C. § 2680(h), a provision of the Federal Tort Claims Act that grants federal agencies sovereign immunity from intentional torts.[5] We have often observed that federal decisions construing the federal act are persuasive authority in construing Alaska's immunity statute.[6]

The most recent United States Supreme Court decision construing the federal intentional-tort immunity provision is *Sheridan v. United States.*[7] In *Sheridan*, "an obviously intoxicated off-duty serviceman" fired a gun into a car as it passed by on the grounds of a naval base, injuring the car's occupants.[8] The injured plaintiffs sued the government. Relying on certain regulations that applied on the base, they argued that the government had undertaken a "good Samaritan" duty that required government personnel to exercise reasonable care to protect them from being assaulted. The plaintiffs contended that the government breached this duty because several federal employees had seen the assailant wandering around with a loaded weapon shortly before the shooting but had failed to restrain him or alert the appropriate authorities.[9]

The government moved to dismiss the complaint under § 2680(h), asserting that the intentional-tort immunity provision barred the plaintiffs' action because their complaint asserted a claim arising out of an assault.[10]

The *Sheridan* Court rejected this argument. As an initial matter, the Court pointed out, § 2680(h) did not directly apply to the

---

**1.** *Mechanical Contractors of Alaska, Inc. v. State, Dep't of Pub. Safety,* 91 P.3d 240, 244 (Alaska 2004).

**2.** *Alakayak v. British Columbia Packers, Ltd.,* 48 P.3d 432, 447 (Alaska 2002).

**3.** *Barry v. University of Alaska,* 85 P.3d 1022, 1025–26 (Alaska 2004) (quoting *Braund, Inc. v. White,* 486 P.2d 50, 54 n. 5 (Alaska 1971)).

**4.** *Cf. Barry,* 85 P.3d at 1026.

**5.** 28 U.S.C. § 2680(h) provides that the federal government's waiver of immunity shall not apply to "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prose-

cution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights."

**6.** *See, e.g., P.G. & R.G. v. State, Dep't of Health & Human Servs.,* 4 P.3d 326, 335 (Alaska 2000).

**7.** 487 U.S. 392, 108 S.Ct. 2449, 101 L.Ed.2d 352 (1988).

**8.** *Id.* at 393, 108 S.Ct. 2449.

**9.** *Id.* at 394–95, 108 S.Ct. 2449.

**10.** *Id.*

assailant's conduct: the Federal Tort Claims Act attaches only to injuries caused by government employees acting within the scope of government employment; but the assailant in *Sheridan* was off duty, acting outside the scope of his employment, when he committed the assault.[11] In any event, the Court observed, the plaintiffs' theory of liability did not rely on the assailant's conduct. Instead, the theory asserted that the government breached its good Samaritan duty because other government employees on base neglected to take reasonable steps to prevent the assault by failing to report or restrain the assailant before the assault occurred.[12]

In recognizing that § 2680(h) did not bar the plaintiffs from pursuing their claim under this theory, the *Sheridan* Court reasoned that Congress could not rationally have intended to make the government's liability for breaching its good Samaritan duty hinge on the fortuitous circumstance of the assailant's employment: "[I]n a case in which the employment status of the assailant has nothing to do with the basis for imposing liability on the Government, it would seem perverse to exonerate the Government because of the happenstance that the [assailant] was on a federal payroll." [13]

Since the assailant in *Sheridan* did not commit the assault while he was on duty, the majority opinion found no reason to discuss whether the government could have been held liable if an *on-duty* government employee had committed the assault. But Justice Kennedy's concurring opinion in *Sheridan* directly addressed the point. Because B.R.'s case squarely raises this issue, Justice Kennedy's concurrence provides helpful guidance here.

Justice Kennedy began his concurrence by accepting the *Sheridan* majority's premise that injuries "can arise from multiple causes" and that, in immunizing the government from intentional torts, Congress did not intend the intentional-tort immunity statute to shield the government in a "multiple-cause" case from all claims alleging breaches of separate duties, such as a duty to protect others from a foreseeable assault.[14] To decide when claims of this kind should be allowed, Justice Kennedy reasoned, the crucial inquiry should be whether the claim asserts the breach of a "separate duty *independent from the employment relation*" [15]—in other words, a duty unrelated to the duties the government acquires as the employer of the primary assailant.[16] Without this limitation on the scope of a permissible "independent duty," Justice Kennedy observed, "litigants could avoid the substance of the [intentional-tort] exception because it is likely that many, if not all, intentional torts of Government employees plausibly could be ascribed to the negligence of the tortfeasor's supervisors. To allow such claims would frustrate the purposes of the exception." [17]

In Justice Kennedy's view, then, a viable claim against the government for breaching an independent duty to protect the claimant from an assault by a government employee has two prerequisites: the claim must assert a theory of liability based on a government duty that (1) is distinct from the duty breached in committing the intentional tort and (2) would have existed and could have been breached even if the assailant had not been a government employee.[18]

---

**11.** *Id.* at 400–01, 108 S.Ct. 2449 (relying on 28 U.S.C. § 1346(b), which is incorporated by reference in 28 U.S.C. § 2680(h)). Although AS 09.50.250 is nearly identical to the Federal Tort Claims Act, the "scope of employment" language in § 1346(b) does not appear in AS 09.50.250.

**12.** *Id.* at 401–02, 108 S.Ct. 2449.

**13.** *Id.* at 402, 108 S.Ct. 2449.

**14.** *Id.* at 406, 108 S.Ct. 2449 (Kennedy, J., concurring).

**15.** *Id.* at 406, 108 S.Ct. 2449 (emphasis added).

**16.** *Id.*

**17.** *Id.* at 407, 108 S.Ct. 2449.

**18.** Justice Kennedy's concurrence repeatedly emphasized the importance of the second prong of this requirement, describing it in slightly different ways: "[A] court must ascertain whether the alleged negligence was ... the breach of some separate duty independent from the employment relation." *Id.* at 406, 108 S.Ct. 2449. "On this theory [of the good Samaritan duty], the Government's negligence is independent of its employment relation with [the off-duty serviceman]." *Id.* at 407, 108 S.Ct. 2449. "This theory of liability does not depend on the employment status of the intentional tortfeasor." *Id.*

The point addressed by Justice Kennedy's concurring opinion remained unresolved in Alaska until we issued our recent decision in *Kinegak v. State*.[19] In *Kinegak*, we adopted Justice Kennedy's *Sheridan* concurrence as the correct approach under Alaska's intentional-tort immunity provision, AS 09.50.250(3).[20] We observed that in the seventeen years since *Sheridan* was decided, Justice Kennedy's concurrence had been widely followed: "Most federal circuit courts that have addressed the question have said that the government is liable for harm caused by intentional torts, provided the government breached some 'independent duty' that has a basis other than negligent supervision, training, or hiring of government employees."[21] Citing various federal cases supporting this proposition,[22] we concluded that the superior court had properly dismissed Kinegak's false-imprisonment claim, which alleged that the Department of Corrections had negligently supervised the employees who miscalculated Kinegak's sentence, thereby causing him to be held in jail beyond the end of his term.[23]

■ As applied to the facts alleged in B.R.'s complaint, Justice Kennedy's approach precludes B.R.'s claims to the extent that they merely assert breaches of the department's duty to exercise due care in hiring, training, and supervising Bullock as its employee. Even though these claims depict the wrongful conduct as the department's "negligent hiring" or "negligent training" instead of as Bullock's intentional acts of assault, they appear to depend only on Bullock's employment status, and could not support a finding of breach unless Bullock acted as a state employee.

■ But the same approach leads to a different conclusion to the extent that B.R.'s complaint potentially encompasses theories of liability that are not grounded on the department's employment relation with Bullock, that is, theories based on the breach of a duty to supervise an employee other than Bullock or based on the breach of some independent protective duty to prevent Bullock's assault.

Here, as we have already noted, B.R.'s complaint is broadly phrased to include a claim that the department negligently failed to train "employees," an allegation broad enough to cover employees other than Bullock. In connection with this claim, B.R. alleges that she "ask[ed] for a female escort and one was provided. However, when B.R. went to receive medical attention the escort remained outside the examination room." Furthermore, a report prepared by the Alaska State Troopers suggests that a nurse may have been present in the examination room during the second assault. If the department negligently failed to train or supervise these employees, then its negligence would have breached a supervisory duty that was separate from any duty stemming from its employment of Bullock, so the breach would not have depended on Bullock's status as a department employee.

Moreover, even though the circumstances described in B.R.'s complaint undeniably focus on the department's duties as Bullock's employer, they necessarily implicate a separate protective duty as well. We have previously recognized that the department stands in a special relationship with inmates and that this relationship gives rise to a special protective duty: the duty to exercise "reasonable care for the protection of [the prisoner's] life and health."[24] Apart from any supervisory duties that might have arisen from its employment relationship with Bullock, then, the department owed a separate duty to take reasonable precautions to protect B.R. from foreseeable misconduct that Bullock might commit during B.R.'s examinations.

This protective duty qualifies as "independent" in both senses required under *Kinegak's* and Justice Kennedy's approach: the

---

19. 129 P.3d 887 (Alaska 2006).

20. *Id.* at 891–93.

21. *Id.* at 891 (footnote omitted).

22. *Id.* at 891 n. 30 (citing cases).

23. *Id.* at 892.

24. *State, Dep't of Corr. v. Johnson*, 2 P.3d 56, 59–60 (Alaska 2000).

duty is "separate" from any duty breached in connection with Bullock's conduct, and it is "independent" because it has no relation to Bullock's employment status—in other words, regardless of whether Bullock was acting as a department employee, an independent contractor, a privately retained physician's aid, or a volunteer health care provider when he examined B.R. at the jail, the department would have had a duty to protect her and could have breached this duty by negligently exposing her to an unreasonable risk of harm from Bullock.

*Bembenista v. United States,*[25] one of the federal cases we cited with approval in *Kinegak,*[26] illustrates this conclusion. In *Bembenista,* a medical technician who worked on the staff of a military hospital (the Walter Reed Army Medical Center, or WRAMC) repeatedly molested an incompetent hospital patient, Mrs. Bembenista; her husband sued the government, claiming that it negligently hired and supervised the technician and, more generally, that it negligently failed to protect Mrs. Bembenista, its patient. The D.C. Circuit Court of Appeals reversed a trial court order dismissing the case as barred by intentional-tort immunity. Quoting Justice Kennedy's *Sheridan* concurrence, the court of appeals recognized that the hospital owed an independent protective duty to patients and could be held directly liable for breaching this duty if it negligently failed to protect Mrs. Bembenista:

> WRAMC's duty of protective care arose out of its special relationship with Mrs. Bembenista; "[t]his theory of liability does not depend on the employment status of the intentional tortfeasor." 108 S.Ct. at 2458 (Kennedy, J., concurring in the judgment). WRAMC would be liable even if Mrs. Bembenista had been assaulted by a private person unconnected with the government.[27]

Because the court concluded in *Bembenista* that immunity did not bar the plaintiff's claim for breach of WRAMC's independent protective duty to its patients, the court found no need to "reach the more troublesome question whether the government would be liable for the mere negligent retention and supervision of a medical technician known to be psychologically disturbed."[28] By avoiding this "troublesome" issue, the court implicitly recognized that, in situations like the one presented there and the one before us now, a claim for negligent supervision can properly be based on the government's breach of a special protective duty, even though a functionally equivalent negligent-supervision claim might be barred if it were merely grounded on the government's general duty to supervise employees.[29]

---

25. 866 F.2d 493 (D.C.Cir.1989).

26. *Kinegak,* 129 P.3d at 891 n. 30 (approvingly citing *Bembenista* and other cases as following Justice Kennedy's concurring approach in *Sheridan*).

27. *Bembenista,* 866 F.2d at 498.

28. *Id.*

29. Our recent rejection of a negligent-supervision claim on immunity grounds in *Kinegak* does not conflict with the *Bembenista* court's analysis of this point. In *Kinegak* an inmate who was mistakenly held in jail for several days after he completed his sentence sued the Department of Corrections for false imprisonment, alleging that the department violated its duty to train and supervise employees who performed the department's record-keeping functions. As we emphasized in *Kinegak,* this negligent-supervision theory was not grounded on a breach that could be considered independent under the standard set out in Justice Kennedy's *Sheridan* concurrence, since *Kinegak's* theory relied on a violation of the

department's supervisory duty as an employer. *See Kinegak,* 129 P.3d at 892. More fundamentally, under the facts presented in *Kinegak,* both duties at issue there—the department's duty to keep accurate records of Kinegak's sentence and its duty to train and supervise the employees who kept those records—were part of the conduct comprising the intentional tort: the department's failure to release Kinegak when his sentence was fully served. Given these circumstances, we recognized that keeping accurate records became an inseparable component of Kinegak's false imprisonment, as opposed to being an independent harm committed by negligently failing to prevent a distinct intentional harm. *Id.*

Notably, almost all federal cases that have declined to allow liability based on a negligent-supervision theory have simply involved a situation in which no independent duty was claimed or established. *See, e.g., Leleux v. United States,* 178 F.3d 750, 758 (5th Cir.1999) (refusing to allow recruit to sue the Navy for negligence in allowing recruiting officer to seduce her and infect her with herpes, emphasizing that recruit "does not allege that the Government had any

Here, the department's brief on appeal expressly acknowledges that "B.R.'s independent duty claim might be based on the state's failure to protect her after it had notice of the first assault." The department nevertheless argues that the record contains no facts to support B.R.'s independent-duty theory. But this argument overlooks the scope of the state's burden in moving for summary judgment.

To prevail completely on summary judgment, the department would have had to meet its "entire burden" of establishing a prima facie case by pointing out uncontested facts or admissible evidence negating the possibility that, given the facts stated in the complaint, independent-duty liability could have been found under the *Kinegak* test.[30] Here, the department failed to meet this burden. Indeed, in its pleadings and arguments before the superior court, the department failed even to acknowledge the possibility of an independent-duty theory, except a possible theory based on the department's duty as an employer to use due care in hiring and training Bullock.[31]

Admittedly, the department's failure to recognize and address the possibility of such a theory in the superior court may well reflect the complaint's inattention to the independent-duty requirement. Yet as we have already pointed out above, even though B.R.'s complaint largely focused on theories that seem narrowly phrased to assert claims grounded only on the state's employment relationship with Bullock—for example, claims that the state negligently violated its duty of due care in hiring and training Bullock as an employee—the complaint nonetheless describes at least one theory grounded

on the department's failure to supervise other employees. As to this claim at least, the summary judgment should not have been granted. It follows that complete dismissal of B.R.'s complaint was improper.

Moreover, we think that it would be unfair to attribute too much significance to the complaint's narrow focus on theories involving the department's employment relationship with Bullock. As we have seen, the approach we adopted in *Kinegak* clarified Alaska law by recognizing for the first time that a claim against the state for negligently supervising an intentional wrongdoer can survive only if it alleges liability based on a separate duty independent from the primary wrongdoer's status as a state employee. Here, the complaint's failure to include claims explicitly based on the broader theory that the state breached its independent protective duty to B.R. may well be explained by the uncertain state of Alaska law before we decided *Kinegak:* B.R.'s appeal had already been submitted for decision when our opinion in *Kinegak* was published.

As illustrated in *Bembenista,* the problems created by the current complaint's narrowly aimed phrasing might have been resolved by reframing its claims to allege breaches of the department's independent protective duty. On remand, then, given the recency of our decision in *Kinegak,* B.R. should be allowed the opportunity to amend her complaint.

## V. CONCLUSION

Because the department's summary judgment motion failed to address a potentially viable claim alleging liability based on the department's negligent failure to train employees other than Bullock, and because, in

duty to protect her independent of its employment relationship with [the recruiting officer]"), *cited in Kinegak,* 129 P.3d at 891 n. 30 (citing *Bembenista* and other cases that follow Justice Kennedy's concurring approach in *Sheridan* ).

30. *Cf. Barry,* 85 P.3d at 1026.

31. Although the department asserted at oral argument that the independent-duty claim has effectively been waived because B.R. did not explicitly argue it before the superior court, this argument is unpersuasive. In ruling on the department's summary judgment motion, the superior court had an obligation to examine the rec-

ord independently in order to determine whether the department had presented a prima facie case supporting its right to complete summary judgment. B.R.'s failure to emphasize her independent-duty claim did not relieve the court of this obligation. *Cf. American Restaurant Group v. Clark,* 889 P.2d 595, 598 (Alaska 1995) ("[E]ven if [the non-movant] failed to bring the relevant . . . testimony . . . to the superior court's particular attention, it did not relieve the superior court of its obligation to examine the record before determining that no genuine issue of material fact existed.").

light of our recent decision in *Kinegak*, B.R. may well be able to frame additional viable theories based on the department's independent protective duty to inmates, we RE-VERSE the superior court's summary judgment order dismissing B.R.'s claims and REMAND for further proceedings.

FABE, Justice, with whom CARPENETI, Justice, joins, concurring in part and dissenting in part.

FABE, Justice, with whom CARPENETI, Justice, joins, concurring in part and dissenting in part.

I agree with the court's conclusion that B.R. should be permitted to bring a claim based on the State's breach of its "special protective duty" to inmates, and that a claim sounding in this duty is distinguishable from the one rejected in *Kinegak v. State, Department of Corrections*.[1] I write separately, however, to point out two additional reasons for allowing B.R.'s negligent hiring and supervision claim to proceed. First, unlike the conduct at issue in *Kinegak*, the conduct at issue here is unrelated to the core functions of DOC. A second basis for distinguishing this case is that *Kinegak* should be interpreted as narrowly as possible on public policy grounds.

1. 129 P.3d 887 (Alaska 2006) (holding that AS 09.50.250(3) barred an action against DOC for negligent record keeping that resulted in the plaintiff's imprisonment for a week beyond the end of his sentence).

2. *See* Lauren Villa, *Public Service, Private Entity: Should the Nature of the Service or Entity Be Controlling on Issues of Sovereign Immunity?*, 78 St. John's L.Rev. 1257, 1257–58 (2004) (arguing that the "principal justification for sovereign immunity" is that "the public's interest in the continued delivery of essential services far outweighs their interest in redressibility," and advocating the expansion of sovereign immunity to certain private entities; *but see Barker v. City of Santa Fe*, 47 N.M. 85, 136 P.2d 480, 482 (1943) (quoting 75 A.L.R. 1196):

   It is almost incredible that in this modern age ... and in a republic, the medieval absolutism supposed to be implicit in the maxim, "the King can do no wrong," should exempt the various branches of the government from liability for their torts, and that the entire burden of damage resulting from the wrongful acts of the government should be imposed upon the

## I. Relation Between the Conduct at Issue and Core Governmental Functions

One of the primary goals of sovereign immunity is to prevent litigation from impeding the essential functions of state government.[2] For example, arrest decisions are generally given a wide degree of latitude because permitting plaintiffs to sue the government for good-faith arrest decisions that later prove to be incorrect could endanger public safety by deterring police from making proper arrests.

The conduct at issue in *Kinegak*—keeping records of prisoners' release dates—was clearly an essential function of DOC. But no such argument can be made for the conduct at issue here. Although providing medical care to inmates is indeed an essential function, the specific conduct at issue here is DOC's unnecessary placement of B.R. in a situation in which she was likely to be sexually assaulted, even after she had reported a previous assault by the same perpetrator.[3] Knowingly exposing an inmate to the likelihood of sexual assault is not required by the State's duty to provide medical care to inmates, and is not related to any other legitimate function of DOC. Moreover, it runs contrary to the requirement that DOC administer prisons in a fair and humane manner.[4] Lawsuits that tend to interfere with or prevent such conduct simply do not pose the

single individual who suffers the injury, rather than distributed among the entire community constituting the government, where it could be borne without hardship upon any individual, and where it justly belongs.

3. DOC could have easily performed this function without exposing B.R. to sexual assault by entrusting her treatment to a different medical technician.

4. *Cf. McGinnis v. Stevens*, 543 P.2d 1221, 1237 (Alaska 1975) ("As an extension of the state, the [DOC] must administer Alaska's prisons in a manner which is neither arbitrary nor vindictive."); Cheryl Bell et al., *Rape and Sexual Misconduct in the Prison System: Analyzing America's Most "Open" Secret*, 18 Yale L. & Pol'y Rev. 195, 195–96 (1999) (noting that "[i]n many American prisons, rape and sexual misconduct are often ignored by prison administrators," and that "[t]he scars such trauma leaves behind dramatically alter the lives of scores of women and men, and, once outside prison, they can also negatively affect the public at-large").

same sort of threat to DOC's continued performance of its duties as lawsuits that potentially impair its core functions. Therefore, the policy justification for granting sovereign immunity in *Kinegak*, to the extent that there was one, is absent here.

## II. *Kinegak* Should Be Interpreted as Narrowly as Possible.

A second reason for making a distinction is to limit the harmful effects of the court's decision in *Kinegak*. By adopting an expansive reading of this state's sovereign immunity statute, *Kinegak* eliminates a major incentive for the government to perform essential functions, such as record keeping, correctly.[5] As noted in the dissent, such a ruling "invites more misconduct," and its "most likely practical consequence ... is ... an increase in negligence on the part of the DOC." [6] The most effective way to avoid these consequences is to overturn *Kinegak*.[7] If the court does not overturn *Kinegak*, however, it should at least minimize the harm done by this unfortunate precedent by interpreting it as narrowly as possible.

## III. Conclusion

For the reasons stated above, as well as those given by the court, I would permit B.R.'s negligent hiring and supervision claim to proceed.

---

5. *See Kinegak*, 129 P.3d at 898 (Fabe, J., dissenting); *cf.* Erwin Chemerinsky, *Against Sovereign Immunity*, 53 Stan L.Rev. 1201, 1222–24 (2001) (noting that "[t]here unquestionably is a cost to sovereign immunity in terms of accountability: Government can violate the law and avoid liability" and expressing the hope that "someday the Supreme Court will change course and abolish the doctrine of sovereign immunity from American law"); Lauren K. Robel, *Sovereignty and Democracy: The States' Obligations to Their Citizens Under Federal Statutory Law*, 78 Ind. L.J. 543, 553–55 (2003) (maintaining that sovereign immunity is both "anachronistic" and hostile to "traditional concepts of democratic government," and observing that "states have largely disavowed the idea[ ] ... that there is something

unseemly about citizens requiring states to respond through lawsuits for the injuries they inflict").

6. *Kinegak*, 129 P.3d at 898 (Fabe, J., dissenting).

7. This court's rule of stare decisis requires adherence to precedent unless the court is clearly convinced that (1) a decision is no longer sound, and (2) more good than harm would result from overruling it. *State v. Fremgen*, 914 P.2d 1244, 1245–46 (Alaska 1996). For the reasons stated in the dissent, I believe that *Kinegak* easily meets this test. *Kinegak*, 129 P.3d at 894–98 (Fabe, J., dissenting).